FILED
United States Court of Appeals
Tenth Circuit

August 15, 2017

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SINCLAIR WYOMING REFINING
COMPANY, and SINCLAIR CASPER
REFINING COMPANY,

        Petitioners,

v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY,

        Respondent.

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

STATE OF WYOMING,

        Amicus Curiae.

No. 16-9532

---

**PETITION FOR REVIEW OF A FINAL ORDER FROM
ENVIRONMENTAL PROTECTION AGENCY
(EPA No. EPA-1:CAA-08-2011-007)**

---

Jeffrey R. Holmstead (Brittany M. Pemberton with him on the briefs) Bracewell
LLP, Washington, D.C., for Petitioners.

Paul Cirino, Environmental Defense Section, Environment and Natural Resources
Division, United States Department of Justice (John C. Cruden, Assistant
Attorney General, Jeffrey H. Wood, Acting Assistant Attorney General, and
Susan Stahle, Of Counsel, United States Environmental Protection Agency, with
him on the briefs) Washington, D.C., for Respondent.

Erik E. Peterson, Senior Assistant Attorney General, Wyoming Office of the
Attorney General, Cheyenne, Wyoming, on briefs for Amicus Curiae.

Before **TYMKOVICH**, Chief Judge, **LUCERO**, and **MORITZ**, Circuit Judges.

**TYMKOVICH**, Chief Judge.

In an amendment to the Clean Air Act (CAA), Congress directed the EPA to operate a Renewable Fuel Standards Program (the RFS Program) to increase oil refineries' use of renewable fuels. But for small refineries that would suffer a "disproportionate economic hardship" in complying with the RFS Program, the statute required the EPA to grant exemptions on a case-by-case basis.

We conclude the EPA has exceeded its statutory authority under the CAA in interpreting the hardship exemption to require a threat to a refinery's survival as an ongoing operation. That interpretation is outside the range of permissible interpretations of the statute and therefore inconsistent with Congress's statutory mandate. Because we find that the EPA exceeded its statutory authority, we vacate the EPA's decisions and remand to the EPA for further proceedings.

## I. Background

In the Energy Policy Act of 2005, Congress amended the CAA to encourage the use of renewable fuels. The statute's RFS program requires oil refineries to either produce a sufficient proportion of renewable fuels as part of their output or purchase credits generated by other refineries to meet their increased renewable-fuel obligations. *See* 42 U.S.C. § 7545(o); 40 C.F.R. § 80.1429. But Congress

also directed that small refineries may receive a statutory exemption if participation in the program would cause them "disproportionate economic hardship." 42 U.S.C. § 7545(o)(9)(B).

## A. *The Renewable Fuel Standards Program*

Through the RFS Program, Congress prescribed annual target volumes for renewable fuel sales, which increase each year until reaching a maximum level in 2022.[1] Congress charged the EPA with implementing the RFS Program and empowered it with authority to alter the statutory volumes of renewable fuel if the EPA finds that the RFS Program is causing severe economic or environmental harm or there is an inadequate supply of domestic renewable fuels. The EPA must also consult with the Department of Energy (DOE) in exercising this power. *See* 42 U.S.C. § 7545(o)(7). The statute further requires "obligated parties," including "refineries, blenders, and importers," to comply with the RFS Program. 42 U.S.C. § 7545(o)(3)(B)(ii).

Under the EPA's accompanying regulations, an obligated party must satisfy its Renewable Volume Obligation each year by holding sufficient credits, known as Renewable Identification Numbers (RINs), at the end of each compliance year. A RIN is created when a producer makes a gallon of renewable fuel, blends the renewable fuel with petroleum-based fuel, and sells the resulting product

---

[1] The RFS Program is codified as Clean Air Act § 211(o), 42 U.S.C. § 7545(o)(7).

domestically. 40 C.F.R. § 80.1429. An obligated-party can accumulate RINs to meet its RFS Program requirement by: (1) blending renewable fuels into petroleum-based fuel and selling the product domestically; or (2) obtaining RINs through another source, such as the RIN trading system Congress directed the EPA to establish. *See* 42 U.S.C. § 7545(o)(5). Put simply, the program induces refineries to produce renewable fuel products (e.g., ethanol), and if they cannot, to purchase biofuel-generated credits from refineries that can.

### B. Small Refinery Exemptions

Congress was aware the RFS Program might disproportionately impact small refineries because of the inherent scale advantages of large refineries and therefore created three classes of exemptions to protect these small refineries.

First, the statute exempted all small refineries from the RFS Program until 2011. 42 U.S.C. § 7545(o)(9).

Second, in the meantime, Congress directed DOE to conduct a study "to determine whether compliance [with the RFS Program] . . . would impose a disproportionate economic hardship on small refineries" after the program's implementation. 42 U.S.C. § 7545(o)(9)(A)(ii)(I). DOE conducted the study in 2011 and determined that a number of small refineries, including Sinclair's two Wyoming refineries, would suffer "disproportionate economic hardship" if they

-4-

were required to comply with the RFS Program.[2]  Accordingly, the EPA extended the blanket exemption for two more years.

Third, after the exemption period expired, Congress provided a process for small refineries to petition the EPA "at any time" for an extension of the initial exemption "for reason of disproportionate economic hardship."  42 U.S.C. § 7545(o)(9)(B)(i).  In evaluating these petitions, the EPA must consult with DOE and consider the findings of DOE's study in addition to "other economic factors." 42 U.S.C. § 7545(o)(9)(B)(ii).

This third exemption is at issue in this case.

## C. Sinclair's Petitions for Small Refinery Exemptions

Sinclair owns and operates two refineries in Wyoming: one located in Sinclair, Wyoming, and another in Casper, Wyoming.  Both fall within the RFS

---

[2]  DOE actually completed its first study in 2009, concluding that no small refineries would suffer "disproportionate economic hardship" if they were required to comply with the RFS Program.  But Congress was unhappy with DOE's methodology and directed the Agency to conduct a new study, requiring it to "seek and invite comment from small refineries on the RFS exemption hardship question, assess RFS compliance impacts on small refinery utilization rates and profitability, evaluate the financial health and ability of small refineries to meet RFS requirements, study small refinery impacts and regional dynamics by PADD, and reassess the accuracy of small refinery compliance costs through the purchase of renewable fuel credits."  See S. Rep. No. 111-45, at 109 (2009), 2009 WL 1994747.

DOE completed its second study in 2011, concluding that "[i]f certain small refineries must purchase RINs that are far more expensive than those that may be generated through blending, this will lead to disproportionate economic hardship for those effected entities."  J.A. Vol. 1 at 69 (alteration incorporated).

Program's definition of "small refinery" and were exempt from the RFS requirements until 2011. Those exemptions were extended until 2013 after DOE found Sinclair's Wyoming refineries to be among the 13 of 59 small refineries that would continue to face "disproportionate economic hardship" if required to comply with the RFS Program.

Sinclair then petitioned the EPA to extend their small-refinery exemptions, arguing that both refineries would continue to suffer "disproportionate economic hardship" under the RFS Program. The EPA denied Sinclair's petitions in two separate decisions, finding that both refineries appeared to be profitable enough to pay the cost of the RFS Program. Sinclair filed a timely petition for review with this court. We grant Sinclair's petition for review, vacate the EPA's decisions for both of Sinclair's refineries, and remand for further proceedings consistent with this opinion.

## II. Analysis

We review Sinclair's petitions under the Administrative Procedure Act (APA). The APA requires courts to consider agency action in conformity with the agency's statutory grant of power, and agency action is unlawful if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). *See generally id.* § 706 (describing additional agency actions that reviewing courts can hold unlawful and set aside, including arbitrary and capricious rulings).

We review questions of statutory interpretation de novo. *EnergySolutions, LLC v. Utah*, 625 F.3d 1261, 1271 (10th Cir. 2010).

## A. *Judicial Review of Agency Action*

When a court reviews an agency's legal determination, it generally applies the analysis set out by the Supreme Court in *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Under *Chevron*, reviewing courts apply a two-step analysis. *Chevron* step one asks "whether Congress has directly spoken to the precise question at issue." *Id.* at 842–43. If Congress's intent is clear, then both the court and the agency "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843. Courts determine Congress's intent by employing the traditional tools of statutory interpretation, beginning—as always—with an examination of the statute's text. *See New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1223–24 (10th Cir. 2017). But, if Congress has "not directly addressed the precise question at issue"—if "the statute is silent or ambiguous with respect to the specific issue"—the court must determine at *Chevron* step two "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843–44.

In some circumstances, however, a court never reaches the *Chevron* analysis. In such cases, we do not need to answer the step one or step two questions. As the Supreme Court explained in *United States v. Mead Corp.*, 533 U.S. 218 (2001), the initial step of the *Chevron* inquiry is actually to determine whether *Chevron* should

*apply at all. See* Cass R. Sunstein, *Chevron Step Zero*, 92 Va. L. Rev. 187, 247 (2006) (conceptualizing the inquiry of whether *Chevron* applies as "*Chevron* step zero"); *see also Gutierrez-Brizuela v. Lynch*, 834 F.3d. 1142, 1157 (10th Cir. 2016) (Gorsuch, J., concurring) (discussing the step zero inquiry and the confusion created by *Mead*).[3]

In *Mead*, the Court held that *Chevron* applies only where "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226–27. This context-driven determination requires us to examine the method by which the agency exercised its delegated authority. *Mead* instructs: "It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." *Id.* at 229–30. *Mead* thus created, in effect, a "safe harbor of *Chevron* deference"

---

[3] We note that neither party discussed the Supreme Court's decision in *City of Arlington v. Federal Communications Commission*, 133 S. Ct. 1863 (2013), in their supplemental briefs. We have not previously addressed the effect—if any—*City of Arlington* might have on our application of the *Mead* inquiry. But we do note that Justice Scalia, writing for the majority in *City of Arlington*, reaffirmed that courts must determine whether *Chevron* or *Mead* controls at step zero. *See* 133 S. Ct. at 1874 ("The dissent is correct that *United States v. Mead* requires that, for *Chevron* deference to apply, the agency must have received congressional authority to determine the particular matter at issue in the particular manner adopted. *No one disputes that*." (emphasis added)).

for agency interpretations produced via formal agency action—formal rulemaking or adjudication—and those produced via informal notice-and-comment rulemaking. Charles H. Koch, Jr. & Richard Murphy, 3 Admin. L. & Prac. § 10:12 (Feb. 2017 update); *see also* Richard J. Pierce, Jr., *Administrative Law Treatise*, § 3.5 (2010) ("After *Mead*, it is possible to know only that legislative rules and formal adjudications are always entitled to *Chevron* deference, while less formal pronouncements like interpretative rules and informal adjudications may or may not be entitled to *Chevron* deference.").

In situations where *Chevron* does not apply, *Mead* requires us to examine the persuasiveness of agency action with no thumb on the scale of judicial deference. As *Mead* explained, we follow the analysis set forth in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). In that case, the Court explained that the weight courts provide an administrative judgment "will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 140.

Following *Mead*, the Court examined agency action that was less formal than notice-and-comment rulemaking when it reviewed an opinion letter issued by the Social Security Administration. *See Barnhart v. Walton*, 535 U.S. 212, 221–22 (2002). It found that such informal agency action "does not automatically deprive that interpretation of the judicial deference otherwise its due," but rather, whether

-9-

courts provide *Chevron* deference "depends in significant part upon the interpretive method used and the nature of the question at issue." *Id.* The factors the Court considered included the interstitial nature of the legal question, the related expertise of the agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the agency had given the question over a long period of time. *Id.* at 222.

The question we must answer, then, is whether to apply *Chevron* or *Skidmore* deference to the EPA's use of informal adjudications to resolve Sinclair's petitions. *See WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1188 (10th Cir. 2013). Sinclair argues that we should review the EPA's decisions using only *Skidmore* deference, but maintains it would still prevail under a more deferential *Chevron* review. Aplt. Supp. Br. at 1–2. The EPA, of course, argues the opposite.

As a preliminary matter, we acknowledge that the EPA's decisions resolving Sinclair's hardship petitions were conducted via informal adjudication (the same procedure employed by the U.S. Customs Service in *Mead*). The parties do not seriously contest this conclusion. The decisions were *adjudications* because they were specific to the parties at issue—in fact, they were specific even to the individual refineries at issue (the EPA produced separate decisions for the Sinclair, Wyoming and Casper, Wyoming refineries)—and were resolving petitions for Sinclair's exemptions from the RFS Program. The decisions were also *informal* because they were resolved on the basis of Sinclair's submissions and involved no

oral argument, opportunity for cross-examination, or other "trial-like" procedures generally required by the APA. *See* Pierce, *supra*, at Vol. 1 § 8.2 (describing the trial-like procedures the APA requires for formal adjudications); *see also* J.A. Vol. 1 at 31 (the Casper, Wyoming refinery opinion describing Sinclair's submission).

Under *Mead*, we conclude that *Skidmore* deference applies to the EPA's decision here. First of all, Congress specifically authorized the EPA to promulgate regulations on aspects of the RFS Program, but not for the small refinery exemptions. This means the agency did not have the benefit of notice-and-comment about its interpretation of the term "disproportionate economic hardship." *See, e.g.*, 42 U.S.C. § 7545(o)(2)(A)(i) (requiring the EPA to promulgate regulations to "ensure that gasoline sold or introduced into commerce in the United States . . . contains the applicable volume of renewable fuel"). Instead, the EPA conducted its interpretation via informal adjudication. And the fact that the adjudication was *informal* is also important—Sinclair's involvement in the decision-making was limited to submitting petitions and the EPA did not have the benefit of hearing expert testimony on the topic. *See* Pierce, *supra*, at Vol. 1 § 8.2 (describing the trial-like procedures required for formal adjudications).

Additionally, the decisions were not made by the head of the EPA but instead by a mid-level Agency official. *See* Aplt. Supp. Br. at 7–8; *see also, e.g.*, *Groff v. United States*, 493 F.3d 1343, 1352 (Fed. Cir. 2000) (one factor in the court's conclusion that it should provide *Chevron* deference to the agency action was that

the adjudication at issue was "formal and culminate[d] in a formal written decision by the head of the agency, not a nonbinding disposition by a low-level agency official").

Next, the decisions hold no precedential value for third parties. Indeed, the decisions have no precedential value even for the *refiner*, since each petition must be resolved on a case-by-case basis (again, the EPA produced two decisions, one for each of Sinclair's refineries). Nor do third parties have access to the decisions, since the EPA does not publicly release its decisions because they contain confidential business information. Aple. Supp. Br. at 8.

Finally, the EPA's viability analysis is not a longstanding practice, but is, instead, only a few years old.[4]

Thus, *Mead* and *Barnhart* compel our conclusion that Congress did not intend the EPA's interpretation of "disproportionate economic hardship" to have the "force of law." We therefore apply *Skidmore* deference in reviewing the EPA's interpretation.

### B. The "Disproportionate Economic Hardship" Exemption

In analyzing Congress's grant of power to the EPA to administer the RFS Program, we begin, as always, with the statutory text. "Unless otherwise defined,

---

[4] Although the record does not indicate exactly how long the EPA's interpretation of "disproportionate economic hardship" has been in place, as a matter of logic, the EPA's interpretation must have been derived in 2011 at the earliest (the year that DOE released its second study).

-12-

statutory terms are generally interpreted in accordance with their ordinary meaning." *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006); *see also Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.").

### 1. The Statutory Requirement

As previously mentioned, Congress provided that small refineries could petition the EPA to extend their initial exemption from the RFS Program "for reason of disproportionate economic hardship." 42 U.S.C. § 7545(o)(9)(B)(i). The relevant statutory provision reads in full:

> **(B) Petitions based on disproportionate economic hardship**
>
> **(i) Extension of exemption**
> A small refinery may at any time petition the [EPA] Administrator for an extension of the exemption under subparagraph (A) *for the reason of disproportionate economic hardship*.
>
> **(ii) Evaluation of petitions**
> In evaluating a petition under clause (i), the [EPA] Administrator, *in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors*.

42 U.S.C. § 7545(o)(9) (emphasis added).

Although Congress did not define the term "disproportionate economic hardship" in the statute, the provision makes clear that Congress provided the EPA with a comprehensive directive in analyzing and evaluating RFS Program exemptions. The statute prescribes the overall process: (1) when petitions can be made: "at any time"; (2) the relevant agency actors: the EPA must make decisions in "consultation with" DOE; (3) the relevant question: whether a refinery will suffer "disproportionate economic hardship" if it is required to participate in the RFS Program for a given year; and (4) the methodology the agency is to use: the EPA must consider the findings of DOE's 2011 study and "other economic factors." 42 U.S.C. § 7545(o)(9)(B).

With this statutory background, we turn to whether the EPA's decisions comport with Congress's directive to grant exemptions when a small refinery demonstrates that complying with the RFS Program would cause it to suffer a "disproportionate economic hardship."

### 2. The EPA's Decisions

Prior to considering a refinery's petition for a hardship exemption, the EPA receives a recommendation on the petition from DOE. In its 2011 study, DOE created a scoring matrix for determining its recommendations for granting exemptions. The first part of the matrix assesses the "disproportionate structural and economic" impacts of the RFS Program on the refinery, looking both at (1) "disproportionate structural impact metrics" (a refinery's percentage of diesel

-14-

production, access to credit, local market acceptance of renewable fuels, etc.) and (2) "disproportionate economic impact metrics" (the firm's relative refining margin, the degree to which the refiner can blend renewable fuels, whether RINs are a net source of revenue, etc.). J.A. Vol. 1 at 99–102 (DOE's 2011 Small Refinery Exemption Study).

The second part of DOE's matrix assigns scores for three "viability metrics": "(1) whether the cost of compliance 'would reduce the profitability of the firm enough to impair future efficiency improvements;' (2) whether 'individual special events' have had 'a temporary negative impact on the ability of the refinery to comply;' and (3) whether compliance costs are 'likely to lead to shutdown' of the refinery." Aplt. Br. at 13–14 (quoting J.A. Vol. 1 at 103–04).

DOE's interpretation of its methodology does not require that the cost of compliance threaten a refinery's long-term viability. Instead, DOE recommends a 50 percent waiver if the ranking meets a certain threshold on either side of the matrix, although the DOE previously required the ranking meet certain thresholds on *both* sides of the matrix. J.A. Vol. 1 at 17. DOE's scoring change "is due to language included in an explanatory statement accompanying the 2016 Consolidated Appropriations Act," which instructed the DOE as follows: "'If the Secretary finds that either of these two components exists, the Secretary is directed to recommend to the EPA Administrator a 50 percent waiver of RFS requirements

-15-

for the petitioner.'" *Id.* (quoting Consolidated Appropriations Act, 2016, Pub. L. No. 114-113 (2015)).

Here, DOE applied its matrix methodology and recommended the EPA provide a 50 percent waiver of the RFS Program's requirements for both of Sinclair's refineries. *See* J.A. Vol. I at 15–17 (Sinclair, Wyoming refinery decision); J.A. Vol. I at 35–37 (Casper, Wyoming refinery decision).

The EPA rejected DOE's recommendations and denied both petitions.

In denying Sinclair's exemption for the Sinclair, Wyoming refinery, the EPA explained its view that "disproportionate economic hardship" requires a threat to the "longer term prospects" of a refinery:

> *EPA believes viability continues to be an important economic factor for determining "disproportionate economic hardship."* . . . . We consider whether [the Sinclair, Wyoming refinery] will remain a competitive and profitable refinery while satisfying its RFS obligations. EPA notes that it considers profitability not merely in the context of a single year's financial statements, but also in the context of assessing the *longer term prospects* for the refinery. EPA also evaluates viability using metrics considered by DOE in its viability index: (a) compliance costs eliminate efficiency gains (impairment); (b) individual special events; and (c) compliance costs likely to lead to shut down. In reaching our conclusion, we consider all of this information on viability, and additional relevant information as available, to determine whether [the Sinclair, Wyoming refinery] faces a "disproportionate economic *hardship*" from compliance, and not merely an economic *impact*.

J.A. Vol. 1 at 18–19 (quoting DOE 2011 Small Refinery Study) (citations omitted) (emphasis added in first sentence); *see also id.* at 38–39 (EPA's identical analysis in its denial of Sinclair's petition for the Casper, Wyoming refinery).

In applying this long-term viability interpretation, the EPA rejected DOE's matrix scores for both Sinclair refineries. The EPA concluded that "viability" meant only that program costs threatened the "long-term" survival of the refinery, not a short-term comparison to other industry actors:

> In the discussion that follows, EPA independently reviews the information as we consider other economic factors in our analysis, including, but not limited to, profitability, net income, cash flow and cash balances, gross and net refining margins, ability to pay for refinery improvement projects, corporate structure, debt and other financial obligations, RIN prices, and the cost of compliance through RIN purchases. After considering all of this information, EPA finds [the Sinclair, Wyoming refinery] will not experience "disproportionate economic hardship" from compliance with the RFS program.

> As an initial matter, *EPA recognizes its decision differs from DOE's recommendation.* The CAA requires that EPA act on a small refinery's petition "in consultation with" DOE, "consider[ing] the findings of" the DOE Small Refinery Study and "other economic factors." EPA gives weight to DOE's technical evaluation and scoring of the refinery, recognizing that DOE has more experience in assessing, e.g., the impact of a particular special event, and how to balance short-term events with longer term planning and concerns over viability. *However, EPA has responsibility for making the ultimate decision after considering DOE's evaluation and recommendation, and continues to believe that the proper interpretation of the statutory prerequisite—disproportionate economic hardship—involves "examining the impact of compliance costs on a refinery's*

*ability to maintain profitability and competitiveness—i.e.
viability—in the long term.*"

J.A. Vol. 1 at 17–18 (quoting CAA section 211(o)(9)(B)(ii) and, in last sentence,

*Hermes Consol., LLC v. EPA*, 787 F.3d 568, 575 (D.C. Cir. 2015)) (emphasis

added).

Thus, according to the EPA, to show "disproportionate economic hardship" a

small refinery must demonstrate an existential threat: it "faces RFS compliance

costs that would '*significantly impact the operation of the firm, leading eventually*

*to an inability to increase efficiency to remain competitive, eventually resulting in*

*closure*.'"[5]  J.A. Vol. 1 at 19–20 (quoting DOE Small Refinery Study) (emphasis

added); *see also id.* at 39–40 (EPA's identical analysis in its denial of Sinclair's

petition for the Casper, Wyoming refinery).

---

[5]  The dissent describes this sentence as "regrettably inartful," claiming that
the EPA did not mean what it said, but rather applied DOE's viability metrics in a
"nuanced analysis."  Diss. at 1.  But, as we have shown above, we do not read this
sentence in isolation.  And, in any event, the EPA repeats this language in its
advocacy before us, using it to describe the test it applied in resolving Sinclair's
petitions.

> "Viability" is a term of art for purposes of EPA's
> assessment of petitions for small refinery
> exemptions. . . .  EPA has also described this factor as
> *requiring* a small refinery to "show that it faces RFS
> compliance costs that would 'significantly impact the
> operation of the firm, leading eventually to an inability
> to increase efficiency to remain competitive, eventually
> resulting in closure.'"

Aple. Br. at 40 n.11 (internal citations omitted) (emphasis added).

As we discuss next, the EPA's long-term threat of closure requirement is inconsistent with the plain meaning of "disproportionate economic hardship."

### 3. *The Plain Meaning of "Disproportionate Economic Hardship"*

Sinclair claims the EPA's position is that "no matter how disproportionate the economic *impact* of the RFS Program on other refineries, there can be no 'disproportionate economic *hardship*' unless compliance with the RFS Program is so costly that it will eventually force a small refinery to shut down," and argues that this position is contrary to the plain language of the term "disproportionate economic hardship." Aplt. Br. at 34. Sinclair also maintains that the EPA's "viability" test not only fails the agency's statutory duty to compare the refinery at issue with its competitors, but also requires significantly more "hardship" to the refinery than the statute instructs.[6]

The statutory text at issue allows a range of linguistic possibilities in defining "disproportionate economic hardship." But as we discuss below, the EPA's interpretation falls outside the boundaries of permissible choice. It chose a

_____

[6] We reject the EPA's argument that Sinclair "waived" its statutory interpretation argument by failing to raise it during the administrative proceedings. *See* Aple. Br. at 32–33. Sinclair fully explained its understanding of the statutory term as informed by DOE's exemption study and recommendation that Sinclair was eligible for a 50 percent exemption. And, in any event, statutory interpretation is the specialization of the courts, not the agencies. *See Frontier Airlines, Inc. v. Civil Aeronautics Bd.*, 621 F.2d 369, 371 (10th Cir. 1980) ("The general rule requiring exhaustion of remedies before an administrative agency is subject to an exception where the question is solely one of statutory interpretation.").

definition of economic hardship plainly at odds with Congress's statutory command by reading a "viability" requirement into the statute and the "disproportionate" requirement out of it.

We first evaluate Sinclair's argument that the EPA improperly imported a condition of future long-term viability into the statutory language. This question is hardly in dispute, because the EPA admits as much. The EPA concluded its decision for the Sinclair, Wyoming refinery with the following statement:

> EPA does not doubt that Sinclair incurred costs, both planned and unplanned, which affected profitability. However, as discussed above, *EPA believes that it is necessary to show that RFS compliance will have an impact on the refinery's ongoing future viability to be eligible for an exemption.* After considering the full financial picture of [the Sinclair, Wyoming refinery] for 2014 and prior years, EPA does not find that compliance with RFS for 2014 would threaten [the Sinclair refinery]'s viability. Given [the Sinclair refinery]'s situation, we do not believe that an RFS exemption for [the Sinclair refinery] is justified under the statutory requirement of a disproportionate economic hardship.

J.A. Vol. 1 at 20–21 (emphasis added); *see also id.* at 39–40 (similar language in the Casper, Wyoming refinery opinion).

The EPA's use of the word "necessary" proves Sinclair's point. If long-term "viability" was merely *one* element the EPA considered in its "disproportionate economic hardship" analysis, that would be a different story. But by stating that future viability (meaning whether the firm will go out of business) is *necessary*

to—in effect, the *sine qua non* of—its decision, the EPA demonstrates it will not grant an exemption *unless* there is a threat to a refinery's long-term viability.

The EPA's interpretation takes the statutory language too far. First, as a matter of textual exegesis, a "'hardship'" is something that "makes one's life hard or difficult—not just something that makes continued existence impossible." Aplt. Br. at 35; *see Oxford English Dictionary* (2017) (defining "hardship" as "[s]omething which is hard to bear"); *Black's Law Dictionary* (10th ed. 2014) (defining "hardship" as "[p]rivation; suffering or adversity"); *Webster's Third New Int'l Dictionary* 1033 (1971) (defining "hardship" as "something that causes or entails suffering or privation").

"[V]iability," on the other hand, is the "ability to continue or be continued; the state of being financially sustainable." *Oxford English Dictionary* (2017); *see also Webster's Third New Int'l Dictionary* 2548 (1971) (defining "viability" as "the quality or state of being viable," and defining "viable," in turn, as "capable of living"). As a matter of common sense, an experience that causes hardship is less burdensome than an experience that threatens one's very existence. Our law clerks, for example, might say their first year of law school was a "hardship" they suffered, but they could hardly claim that the experience of learning the law threatened their very "viability" (we hope).

The EPA argues that "viability" and "hardship" are the same, since "hardship" can be defined as "suffering" and "privation." Aple. Br. at 38. But as

we just explained, "suffering" and "privation" may be difficult to bear, but they do not necessarily rise to the level of threatening one's very existence. And the EPA's interpretation of "viability" is akin to a death knell, not simple privation. In any event, DOE's matrix analysis supplied three "viability metrics" that collectively determine hardship: (1) reduced profitability; (2) temporary negative events; and (3) risk of closure. *See* J.A. Vol. 1 at 103. The EPA's interpretation ignores two-thirds of this analysis and selects only risk of closure as the appropriate measure of hardship. This is not a reasonable interpretation of the statutory term. In short, the EPA's equation of "hardship" and "viability" improperly transforms Congress's statutory text into something far beyond what Congress plausibly intended.

The statute also commands the EPA to consider the *disproportionate* impact of the RFS Program, which inherently requires a comparative evaluation. The EPA must compare the effect of the RFS Program compliance costs on a given refinery with the economic state of other small refineries. The EPA's viability test involves no such comparison, but instead looks at each refinery in isolation and asks whether the cost of long-term compliance with the RFS Program would force the refinery to shut down. By making long-term viability a necessary factor in its analysis, the EPA impermissibly reads the word "disproportionate" out of the statute. *See Clark v. Rameker*, 134 S. Ct. 2242, 2248 (2014) ("a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous"). The EPA tries to sidestep the comparative nature of

-22-

the "disproportionate economic hardship" by pointing out that the statute requires the EPA to consider DOE's study and "other economic factors." Because viability is one of the factors considered by DOE, the EPA argues it is also an appropriate consideration for the EPA. *See* Reply Br. at 11. But as we explained above, the statutory requirements for what *sources* the EPA must consider in evaluating the petitions are distinct from the overall *purpose* of the inquiry. In effect, the EPA takes the holistic evaluation required by Congress and morphs it into a single question: a threat of closure inquiry.

The EPA's narrow viability evaluation is also not supported by contextual clues in the statutory scheme. Congress, in fact, directed the EPA to apply a closure test for another part of the CAA involving primary nonferrous smelter orders. 42 U.S.C. § 7419(d)(2) (requirement to use continuous emission reduction technology can be waived "upon a showing by the owner or operator of the smelter that *such requirement would be so costly as to necessitate permanent or prolonged temporary cessation of operations* of the smelter." (emphasis added)). Although this CAA provision is not part of the RFS Program, it makes the basic point that Congress knows how to supply a closure test when it intends to do so. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170–73 (2012) (discussing the presumption of consistent usage).

The EPA places significant weight on two recent circuit court decisions addressing § 7545(o)(9)(B)(ii), which it claims support its interpretation of the

statute: *Hermes Consolidated, LLC v. EPA*, 787 F.3d 568 (D.C. Cir. 2015) and *Lion Oil Company v. EPA*, 792 F.3d 978 (8th Cir. 2015).  In *Hermes*, a refinery challenged the EPA's denial of its extension for an economic hardship exemption from the RFS Program (a denial supported by DOE's matrix scheme).  The court rejected the refinery's challenge under *Chevron* step one, concluding that the EPA's reliance on a viability index did not contradict the plain language of § 7545(o)(9)(B) because so long as "EPA consults with DOE and considers the 2011 Study and 'other economic factors,' EPA retains substantial discretion to decide how to evaluate hardship petitions."  *Hermes*, 787 F.3d at 574–75 (internal citation omitted).  The D.C. Circuit also rejected the refinery's *Chevron* step two argument, concluding that the EPA's method of evaluating "'disproportionate economic hardship' is 'based on a permissible construction of the statute.'"  *Id.* at 575 (quoting *Chevron*, 467 U.S. at 843).  In other words, the court found it reasonable for the EPA to incorporate the methodology from the 2011 DOE study, and the viability matrix in particular, because the statute requires the EPA to consider the findings of the study and "other economic factors" in evaluating hardship petitions.  Thus, the court concluded the EPA's choice was within its discretion under *Chevron* step two.  *See id.*

In *Lion Oil*, the Eighth Circuit also rejected the refinery's *Chevron* step one argument.  The court stated that since the statute does not define "disproportionate economic hardship," and Congress delegated authority to the agency to implement

-24-

an ambiguous statute, the court was "'required to accept the agency's statutory interpretation, so long as it is reasonable.'" 792 F.3d at 984 (quoting *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 876 (8th Cir. 2011). The Eighth Circuit concluded that the EPA's choice to measure "hardship" by examining the refinery's viability in the long run was within the agency's discretion, and was thus reasonable. *Id.*

But these cases are distinguishable. As an initial matter, neither the D.C. Circuit nor the Eighth Circuit considered whether *Mead* should control its interpretation of the statute; instead, both courts assumed that *Chevron* applied. Regardless, as we explained above, *Mead* instructs us that *Skidmore* deference is the appropriate standard of review to apply to an informal adjudication that does not carry "the force of law."

The petitioner in *Hermes* argued that mere "[c]onsideration of a viability index" was "inconsistent with [the EPA's] statutory mandate." 787 F.3d at 574. In other words, the EPA could not consider a refinery's viability *at all*, even if viability was considered along with a host of other economic factors. The D.C. Circuit properly rejected that argument. The statutory scheme does not prohibit the EPA from considering viability as a factor. But as we explained above, when the EPA makes long-term viability the *necessary*, if not the sole, factor—refusing to grant an exemption unless there is a threat to a refinery's long-term viability—it renders an interpretation outside the bounds of permissible statutory choice.

-25-

As for *Lion Oil*, the Eighth Circuit's decision does not make clear whether the petitioner argued it was impermissible for the EPA to consider viability as *a factor* in its analysis (as in *Hermes*) or as the *sole factor* in its analysis (as in this case). *See* 792 F.3d at 984. Either way, we are unpersuaded. If the former, our analysis of *Hermes* applies. If the latter, *Lion Oil* improperly interpreted *Hermes* as rejecting the EPA's use of viability as the sole factor in its "disproportionate economic hardship" analysis before relying entirely on the D.C. Circuit's reasoning. *See id.* Consequently, we are unpersuaded by the court's analysis in *Lion Oil*.

*Mead* instructs us to defer to agency interpretations of a statute only to the extent those decisions have the "power to persuade." 533 U.S. at 220. Since our textual and contextual analyses demonstrate that the EPA's interpretation of § 7545(o)(9)(B) is contrary to the meaning and purpose of the statute, the EPA has failed to persuade us here.

## III. Conclusion

By reading a necessary "viability" requirement into its statutory directive to evaluate a refinery's petition for exemption from the RFS program based on "disproportionate economic hardship," the EPA exceeded its statutory authority. We therefore GRANT Sinclair's petition for review, VACATE the EPA's decisions for Sinclair's two Wyoming refineries, and REMAND for further proceedings consistent with this opinion.

Sinclair's June 24, 2016 motion to seal the docketing statement and agency decision documents and its September 9, 2016 motion to seal all the briefs and the joint deferred appendix are GRANTED.

16-9532, Sinclair Wyoming Refining Co. v. United States Environmental Protection Agency
**LUCERO**, J., dissenting.

My majority colleagues predicate their opinion on the premise that the Environmental Protection Agency ("EPA") has impermissibly adopted a test under which a refinery can demonstrate disproportionate economic hardship only upon a showing of an existential threat to ongoing operations. Whether that presumed test would pass muster may present an interesting question, but it is quite academic to the real issue before us. Assuredly, the EPA decisions include a regrettably inartful sentence—a partial quote from the 2011 Small Refinery Exemption Study issued by the Department of Energy (the "Department"). However, when construed as a whole, those decisions demonstrate that EPA applies a more nuanced analysis. Rather than adopting a one-factor test looking solely to whether a shutdown is likely, it seems clear to me that EPA is applying the three-pronged "viability metrics" developed by the Department. Under those standards, a refinery can establish economic hardship under four different circumstances, only one of which requires a threat of shutdown. Because the majority proceeds on a misconstruction of the EPA analysis, I must respectfully dissent.

# I

In its decisions in this case, EPA discussed the Department's study at length.[1] It quotes the Department's determination that "[d]isproportionate economic hardship must encompass two broad components:  [1] a high cost of compliance relative to the industry

---

[1] There are two EPA decisions at issue, one denying an exemption to the Sinclair Wyoming Refinery and one denying an exemption to the Sinclair Casper Refinery. This dissent quotes from the former decision, but the latter is identical in all material respects.

average, and [2] an effect sufficient to cause a significant impairment of the refinery operations." EPA explained that it asked the Department "to evaluate all of the information EPA receives from each petitioner" because the Department "has expertise in evaluating economic conditions at U.S. refineries, which it used in developing an assessment process for identifying when 'disproportionate economic hardship' exists in the context of the [Renewable Fuel Standard ("RFS")] program."

In resolving the two components of cost and sufficiency of the effect, the Department considers numerous factors which are grouped into two categories—structural and viability. In assessing "disproportionate structural impacts," the Department scores a refinery on eight metrics: percentage of diesel production, access to capital/credit, availability of other cash flows, local market, state regulation, relative refining margin, blending capability, and niche market. Under the "viability" category, the Department considers three metrics: whether compliance costs "would reduce the profitability of the firm enough to impair future efficiency improvements"; "[r]efinery specific events (such as a shutdown due to an accident, and subsequent loss of revenue) in the recent past that have a temporary negative impact on the ability of the refinery to comply"; and whether compliance costs are "likely to lead to shut down." Each metric is scored either 0, 5, or 10. Subtotal scores for the structural and viability categories are then averaged and divided by 2. The Department's study determined that an exemption would be warranted only if a refinery had an overall score of 1 or higher in both categories. For the viability category, a refinery can qualify with a score of 10 on any

2

single metric, or with an intermediate score of 5 on both the efficiency and specific event metrics.

After providing background information on Sinclair Wyoming Refinery's operations, the EPA decision reproduces the Department's scoring matrix for the facility. That metric calculated a score of 1.6 on the structural impact category, and 0 for the viability category. Then, EPA evaluated "viability using the metrics considered by [the Department] in its viability index: (a) compliance costs eliminate efficiency gains (impairment); (b) individual special events; and (c) compliance costs likely to lead to shut down." Considering the Department's score of zero on all three viability factors, EPA concluded that Sinclair Wyoming Refinery "remains fully able to comply with its 2014 RFS obligations without causing a significant impairment of the refinery's operations," and thus compliance would not threaten its "viability." EPA specifically considered Sinclair's argument that a fire at the refinery caused a large one-time loss—an argument clearly directed toward the specific event metric. And it discussed the RFS program's impact on efficiency gains as relevant to the first metric.

The majority opinion does not consider this lengthy discussion. If it had, it would be abundantly clear that EPA considers all three of the Department's viability factors. Importantly, a refinery can qualify for an exemption under the Department's matrix without showing that compliance costs would lead to a shutdown. Rather than considering EPA's nuanced approach, the majority opinion focuses on the statement that a refinery must show that compliance costs would "significantly impact the operation of the firm, leading eventually to an inability to increase efficiency to remain competitive,

3

eventually resulting in closure." (Majority Op. 18.) Read in context, that statement does not support the assertion that EPA applies a single-factor test under which a refinery must show a shutdown is likely.[2]

The statement at issue is a direct quote from the Department's Small Refinery Exemption Study. In describing its three viability metrics, the Department explained that the term "viability refers to the ability of the refiners to remain competitive and profitable," which "requires sufficient profits to make investments in the refinery." That statement quoted by EPA explains that "under some circumstances, a small refinery may face compliance costs that would significantly impact the operation of the firm, leading eventually to an inability to increase efficiency to remain competitive, eventually resulting in closure." Read together with the Department's explanation of the metrics, the quoted passage shows that eventual closure is not required. Refineries may receive points under the efficiency metric because "significant constraints on efficiency improvements would eventually leave many small refineries at risk." And the individual special events metric is specifically aimed to provide relief to refineries that have

---

[2] As the majority notes, EPA's brief repeats this statement in a footnote. (Majority Op. 18 n.5.) But as with the decisions at issue, the statement must be read in context. EPA's brief strenuously rejects the reading of its decisions urged by Sinclair and adopted by the majority. After quoting Sinclair's argument that a refinery must demonstrate that RFS compliance "will eventually force a small refinery to shut down," EPA states: "This is not an accurate characterization of EPA's interpretation because it gives the incorrect impression that the Agency will grant the exemption only if it concludes that the refinery will have to close if it has to comply with its RFS requirements." (Resp't Br. 40.) Instead, consistent with its decisions, EPA explains that "[t]he viability factor addresses three types of metrics that could impact long-term competitiveness, none of which necessarily would cause a closure of the facility in the near term." (Id. at 38-39.)

4

suffered incidents causing "a temporary negative impact on the ability of the refinery to comply with the RFS."

In discussing "viability" in the challenged decisions, EPA is referring to all three metrics—not just the possibility of refinery closure. The majority opinion's reliance on the ordinary usage definition of "viability," and its claim that EPA ignored the first two of the Department's viability metrics, (Majority Op. 21, 22), cannot be squared with the text of the challenged decisions. Those decisions unequivocally state that EPA "evaluates viability using the metrics considered by [the Department] in its viability index: (a) compliance costs eliminate efficiency gains (impairment); (b) individual special events; and (c) compliance costs likely to lead to shut down." Therefore, the appropriate question in reviewing the decisions at issue is whether that multi-factor analysis is consistent with the statute.

## II

Regardless of the standard of review applied, EPA's adoption of the Department's three-part viability test should be upheld. See Edelman v. Lynchburg Coll., 535 U.S. 106, 114 n.8 (2002) ("[T]here is no need to resolve deference issues when there is no need for deference."). Congress specifically directed EPA to consider the findings of the Department's Small Refinery Exemption Study. 42 U.S.C. § 7545(o)(9)(B)(ii). Consistent with the Congressional directive, that study created the viability standard actually being applied by EPA.

Consideration of a refinery's overall health makes sense in light of the statute's use of the term "hardship." § 7545(o)(9)(B)(i). As the EPA decision notes, a refinery

5

must show it "faces a 'disproportionate economic <u>hardship</u>' from compliance, and not merely an economic <u>impact</u>." A refinery that spends $5 million per year to meet its RFS obligations and suffers net annual operating losses of $1 million per year would experience more of a "hardship" than a refinery that spends $10 million per year on RFS compliance but nevertheless operates at a profit.

In an "Explanatory Statement" contained in the 2016 Consolidated Appropriations Act, Congress directed the Department to recommend a 50% waiver for refineries that score above 1 on the Department's matrix for either the viability or structural impact categories. <u>See</u> Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242 (2015). Because that statement did not amend the statute, it should have little bearing on our analysis of the statutory text. <u>See</u> <u>Bruesewitz v. Wyeth LLC</u>, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation."). As EPA explained, despite the appropriations rider, the agency "remains constrained by the plain governing statutory language that limits exemption extensions to small refineries that experience a 'disproportionate economic hardship.'" Moreover, as noted by EPA, "a refinery could satisfy the nonviability metrics as a result of primarily refining diesel and not having other lines of business, regardless of how profitable the refinery was or what the impact of compliance with the RFS would be on the refinery." I agree that "it would [not] be appropriate to grant even a 50% waiver for 'disproportionate economic hardship' in these circumstances without some further consideration of whether compliance with the RFS would actually cause such a hardship."

6

Finally, reliance on the Department's study necessarily incorporates a disproportionality element. That study applied the Department's metrics to a broad cross-section of small refineries and found thirteen qualified for an exemption. Under that matrix, Sinclair's refineries do not qualify for an exemption for compliance year 2014. Even if the Department was required to depart from the study's findings due to an appropriations act requirement, EPA followed the statute when it relied on the Department's study in making these evaluations. The agency was mandated to consider both the study and the Department's recommendation. § 7545(o)(9)(B)(ii).

Two other circuits have approved EPA's approach. See Lion Oil Co. v. EPA, 792 F.3d 978 (8th Cir. 2015); Hermes Consol., LLC v. EPA, 787 F.3d 568 (D.C. Cir. 2015). Hoping to avoid a circuit split, my majority colleagues unconvincingly attempt to distinguish these cases. They characterize both as having decided, unlike this case, whether EPA can consider viability as a factor, rather than the only factor. (Majority Op. 25-26.) As explained above, the majority's framing misstates what EPA did in the present case. The majority opinion also dismisses the cases claiming that those courts did not consider the appropriate degree of deference. But both decisions speak favorably of using viability as a factor. See Lion Oil, 792 F.3d at 984 ("Of course, some refineries will face higher costs than others, but whether those costs impose disproportionate hardship on a given refinery presents a different question" and EPA reasonably concluded "that the best way to measure 'hardship' entail[s] examining the impact of compliance costs on a refinery's ability to maintain profitability and competitiveness— i.e., viability—in the long term." (quotation omitted)); Hermes, 787 F.3d at 575 (same).

7

I would uphold, as well, EPA's consideration of viability as described in the Department's Small Refinery Exemption Study.