[Cite as *State ex rel. Yost v. Church of Troy*, 2020-Ohio-4695.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# GEAUGA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO ex rel. DAVE YOST, ATTORNEY GENERAL OF OHIO, | : | **O P I N I O N** |
| | : | |
| Plaintiff-Appellee, | : | **CASE NO. 2019-G-0203** |
| | : | |
| - vs - | : | |
| CHURCH OF TROY, a.k.a. CHURCH AT TROY, et al., | : | |
| Defendants, | : | |
| STEPHEN BEATTY, | : | |
| Defendant-Appellant. | : | |

Civil Appeal from the Geauga County Court of Common Pleas, Case No. 2013 M 000770.

Judgment: Affirmed.

*Dave Yost*, Attorney General, State Office Tower, 30 East Broad Street, 16th Floor, Columbus, OH 43215, *Janean R. Weber*, *Amanda M. Ferguson*, and *Catherine A. English*, Assistant Attorney Generals, Environmental Enforcement Section, 30 East Broad Street, 25th Floor, Columbus, OH 43215 (For Plaintiff-Appellee).

*Stephen Beatty,* pro se, 18777 Mumford Road, Garrettsville, OH 44231 (Defendant-Appellant).

MARY JANE TRAPP, J.

{¶1} Appellant, Stephen Beatty ("Pastor Beatty"), appeals from the judgment of the Geauga County Court of Common Pleas granting appellee, the state of Ohio ex rel. Dave Yost, Attorney General (the "state"), a preliminary injunction against Pastor Beatty,

the Church of Troy a.k.a. the Church at Troy (the "Church"), and James Beatty ("Mr. Beatty") and holding them jointly and severally liable for a civil penalty of $54,000 for non-compliance with Ohio's monitoring requirements for a public water system.

{¶2} Pastor Beatty argues that the trial court erred in determining he was the "operator" of the Church's water system. He also argues that the trial court and the Ohio Environmental Protection Agency ("Ohio EPA") have no authority over the Church since it is a "spiritual entity" rather than a legal entity.

{¶3} Upon a careful review of the record and the pertinent law, we find the trial court did not abuse its discretion in determining that Pastor Beatty was an "operator" of the Church's public water system based on the undisputed evidence of his (1) involvement in and apparent authority to supervise the operation of the Church's water system, and (2) personal participation in the decision-making regarding the Church's water system.

{¶4} To the extent Pastor Beatty raises arguments to challenge the Church's liability, the Church has not filed a notice of appeal from the trial court's judgment, and Pastor Beatty is not a licensed Ohio attorney authorized to represent the Church.

{¶5} Thus, we affirm the judgment of the Geauga County Court of Common Pleas.

**Substantive and Procedural History**

{¶6} The Church operates at 18712 Mumford Road in Troy Township, Geauga County, Ohio. It was previously registered with the state of Ohio as a domestic nonprofit corporation known as the Troy Baptist Church, which was subsequently dissolved. The Church is governed by the King James Bible and has not adopted a corporate constitution

2

or code of regulations. It has no board of trustees or officers. The members of the Church collectively discuss matters relating to the Church and make decisions as a group.

{¶7} The Church's pastor is its spiritual leader. Mr. Beatty served as the Church's pastor for 37 years. He described the pastoral duties as preaching, visiting the homeless and sick, and oversight of the Church. In approximately June 2010, Mr. Beatty retired as pastor due to health issues. He selected his son, Pastor Beatty, to serve as his successor without objection from the Church's members.

{¶8} The real property located at 18712 Mumford Road is titled in the name of "Church of Troy in trust for the Lord Jesus Christ, true and beneficial owner." It contains a well that supplies water to the Church's building for use in faucets and restrooms. The water is available to approximately 100 people on Sundays and approximately 60 to 70 people on Wednesdays.

### Water Monitoring Requirements

{¶9} R.C. Chapter 6109 governs safe drinking water in Ohio. Its stated purpose is "to protect the public health and welfare and to enable the state to assume and retain primary enforcement responsibility under the federal Safe Drinking Water Act." R.C. 6109.03. Ohio EPA is mandated by statute to administer and enforce R.C. Chapter 6109. *See* R.C. 6109.04. "Every owner or operator of a public water system" is required to analyze the water "at certain intervals and in such manner" as Ohio EPA orders, and "[r]ecords of the results of such analyses shall be maintained and reported" as Ohio EPA requires. R.C. 6109.12.

{¶10} Ohio EPA defines a "public water system" as one in which at least 25 people have access to the water any 60 days out of the year. *See* Ohio Adm.Code 3745-81-

3

01(P)(11). Ohio EPA classifies the Church's public water system as a "transient noncommunity water system," which is a system where people have the least exposure to the water. *See* Ohio Adm.Code 3745-81-01(P)(11)(b).

{¶11} There is no statutory exemption from monitoring requirements when the public water system involves a church. *See, e.g.*, R.C. 6109.21(I) (specifically exempting a church from obtaining a license to operate a public water system). In fact, Ohio EPA expressly envisions that public water systems that serve churches are subject to its regulations. *See* Ohio Adm.Code 3745-81-01(P)(11)(b)(ii) ("Examples of" transient noncommunity water systems "may include, but are not limited to, systems serving * * * churches * * *"). Further, in the underlying case, the trial court determined that the Church's water system was a "public water system," and this finding has not been challenged on appeal.

{¶12} Ohio EPA issues annual monitoring schedules for public water systems. Based on the classification of its public water system, the Church is required to take a total coliform sample every quarter and a nitrate sample annually and to have a laboratory analyze the samples and submit the data electronically to Ohio EPA. *See* Ohio Adm.Code 3745-81-21(A)(2)(a) and 3745-81-23(B)(2). Total coliform is a bacterial indicator. Nitrate is a contaminant found in fertilizers and septic systems. Ohio EPA may increase the number of required nitrate samples if nitrate is detected above a certain level. *See* Ohio Adm.Code 3745-81-23(B)(3). If any routine sample for total coliform tests positive, the public water system must take additional samples. *See* Ohio Adm.Code 3745-81-21(B). The owner or operator of the public water system must comply with public

notice requirements following violations or situations that may pose a health risk. *See* Ohio Adm.Code 3745-81-32(B)(1) and (3).

### The Church's Compliance History

{¶13} Ohio EPA has regulated the Church's water system since approximately 1986. Mr. Beatty acknowledged that during his tenure as pastor he was the "operator" of the Church's water system and the sole contact person for Ohio EPA. He collected and submitted water samples to Ohio EPA until he was unable to do so because of poor health. Beginning in 2009 or 2010, Joseph Bohanon, a member of the Church, began taking water samples to Geauga County Water Resources for testing and submission to Ohio EPA and reported the results to Mr. Beatty.

{¶14} The Church failed to submit sampling data for total coliform during the third and fourth quarters of 2009 and the first and second quarters of 2010. Katherine Metropulos, an Ohio EPA inspector assigned to the Church's water system, issued several notices of violation to Mr. Beatty. Ohio EPA also did not receive required verifications from the Church that it posted public notices regarding each failure to sample. Ms. Metropulos also sent multiple letters and made repeated phone calls to Mr. Beatty without response.

{¶15} On June 15, 2010, Ms. Metropulos spoke with Mr. Beatty, who informed her that he was semi-retired and was turning over the responsibility of the Church to Pastor Beatty. Ms. Metropulos also spoke with Pastor Beatty, who provided the phone numbers for his home and personal cell phones. At this time, Ohio EPA changed its point of contact for the Church from Mr. Beatty to Pastor Beatty.

{¶16} On June 30, 2010, Ms. Metropulos conducted a site visit at the Church and explained the Church's sampling requirements to Pastor Beatty. Pastor Beatty informed her that he would wait to sample until he heard from the Ecclesiastical Law Center because he felt the Church was exempt from the requirements. Ms. Metropulos attempted to correct his misunderstanding of the law, and before she left the site, Pastor Beatty initialed the bottom of the site visit report.

{¶17} From the third quarter of 2010 through the third quarter of 2013, Mr. Bohanon continued to take samples of the Church's water but began having them tested at Biosolutions, a privately-owned laboratory. He now reported the results to Pastor Beatty.

{¶18} Mr. Bohanon submitted total coliform samples to Ohio EPA, but they were labeled as "special purpose" rather than routine. Special purpose samples are used for investigations. These samples are not reported to Ohio EPA's database, so inspectors are not notified of a positive result. Ms. Metropulos discovered this activity by personally reviewing its submissions. The Church instructed Mr. Bohanon to label the samples in this manner. Its members discussed the matter and decided the Church's water system was not "public" and thus not subject to Ohio EPA regulations.

{¶19} During this time period, two of the Church's samples tested positive for total coliform and one tested positive for E. coli. The Church failed to conduct the required follow up testing and to submit proof that it posted public notices. The Church also became subject to increased reporting of nitrate samples, which it also failed to perform. Ms. Metropulos continued to send multiple letters and make repeated telephone calls to Pastor Beatty without response.

{¶20} According to Pastor Beatty and Mr. Bohanon, they posted positive test results on the Church's bulletin board and announced them from the pulpit during Church services. Members were informed not to drink the water, and bottled water was provided.

{¶21} Dr. Benjamin Townsend from the Ecclesiastical Law Center located in Michigan sent numerous letters to Ohio EPA purportedly on behalf of the Church where he disputed the Church's legal obligations to comply with Ohio EPA regulations. According to Mr. Townsend, the Center instructed Church leadership to have an independent company test the water. However, he asserted that such activity did not constitute recognition of Ohio EPA's jurisdiction over the Church. Ohio EPA's legal department disputed Dr. Townsend's legal arguments in responses to Pastor Beatty, since Dr. Townsend is not a licensed Ohio attorney and thus not authorized to represent the Church.

{¶22} In August 2013, Ms. Metropulos announced and conducted a sanitary survey at the Church's property following her unsuccessful attempts to schedule an appointment with Pastor Beatty. Pastor Beatty was present, along with two other Church members and his two sons. Ms. Metropulos and David Maschak, an Ohio EPA compliance coordinator, discovered, among other things, that the well cap was on crooked, making it the likely source of the positive total coliform samples. During the inspection, Pastor Beatty stated that the Church's water system was chlorinated quarterly, which could affect the accuracy of sample results. Ohio EPA issued a sanitary survey letter containing numerous required actions, but the Church failed to submit a required response.

{¶23} In September 2013, Ms. Metropulos contacted Pastor Beatty and obtained permission to take samples from the Church's water system. Shortly thereafter, Pastor Beatty rescinded permission. Therefore, Ohio EPA was forced to obtain an administrative search warrant in the Geauga County Court of Common Pleas.

{¶24} During execution of the search warrant, Ms. Metropulos and Mr. Maschak took two samples that tested positive for total coliform and one sample that showed a high level of nitrate, indicating the water contained a manmade source of nitrate.

### The State's Civil Enforcement Action

{¶25} As a result of the Church's repeated and continued noncompliance, Ohio EPA referred the matter to the Ohio Attorney General for enforcement. In August 2013, the state filed a complaint for injunctive relief and civil penalty against the Church, Mr. Beatty, and Pastor Beatty as defendants. The complaint alleged that the defendants were "owners" and/or "operators" of a "public water system" who, on numerous occasions, failed (1) to take total coliform routine samples, (2) to notify the public following total coliform routine monitoring violations, and (3) to monitor for nitrate, in violation of provisions in R.C. Chapter 6109 and its related regulations.

{¶26} The Beattys both filed motions to dismiss. Mr. Beatty contended that he lacked knowledge of the matters set forth in the complaint. Pastor Beatty argued that Ohio EPA and the trial court lacked jurisdiction over the Church. The trial court denied the motions. None of the defendants filed answers to the complaint, and the state filed a motion for default judgment.

{¶27} In January 2014, the trial court held a hearing on the state's motion. The state presented testimony from Ms. Metropulos, Mr. Maschak, and Christel Sherron n.k.a.

8

Lager, an Ohio EPA enforcement coordinator. It also introduced numerous documents, including several notices of violation, reports, written correspondence, and telephone logs. Mr. Beatty and Pastor Beatty appeared on their own behalf but presented no evidence. No one appeared on behalf of the Church.

{¶28} In April 2014, the trial court issued an order finding that there was insufficient evidence to support a default judgment and scheduled an additional evidentiary hearing to determine the following issues: (1) whether the Church was a legal entity which could be sued and was properly served; (2) whether either Mr. Beatty or Pastor Beatty owned or operated a public water system, was a trustee, officer, director, manager, operator, or person authorized to make decisions for the Church, and was legally responsible for the Church's actions; (3) whether all necessary and proper parties had been joined; and (4) whether the state proved its claim against any defendant.

{¶29} The state obtained a continuance of the hearing for purposes of conducting discovery. It issued written discovery requests to the Beattys and took their depositions as well as the deposition of Mr. Bohanon.

{¶30} In October 2014, the trial court held the second evidentiary hearing. The state presented testimony from Pastor Beatty's wife, Rachel Beatty, regarding administrative duties she performs at the Church and specifically her acceptance of certified mail on the Church's behalf containing the state's complaint. The state also presented testimony from Mr. Beatty, Pastor Beatty, and Mr. Bohanon, additional testimony from Ms. Metropulos and Ms. Lager, and additional documents. Mr. Beatty and Pastor Beatty again appeared on their own behalf but presented no evidence. No one appeared on behalf of the Church.

9

### The Trial Court's Judgment Entries

{¶31} In May 2018, the trial court issued a "decision" containing numerous findings of fact and conclusions of law. With respect to its legal conclusions, the trial court found that the Church's water system constitutes a public water system subject to Ohio EPA regulations, that the Church and its members violated R.C. Chapter 6109 and regulations promulgated thereunder, and that injunctive relief was necessary for the protection of the health and safety of the persons attending services at the Church.

{¶32} The trial court also issued a "judgment" in which it enjoined the Church and all members of the Church or those persons who attend services or activities at the Church from violating R.C. Chapter 6109 and the rules promulgated thereunder for regulating public water systems. The trial court ordered the Church to supply the state and the court with the names of the individuals responsible for future maintenance, sampling, and operating of the Church's water system and those persons so designated to acknowledge their responsibilities.

{¶33} Pastor Beatty filed a notice of appeal, which we dismissed for lack of a final, appealable order in *State ex rel. DeWine v. Church of Troy*, 11th Dist. Geauga No. 2018-G-0169, 2018-Ohio-4273, because the trial court did not address civil penalties or the claims against the Beattys individually. *See id.* at ¶8-9.

{¶34} In March 2019, the trial court issued an additional judgment entry to address these outstanding issues, reaffirming its prior judgment entry except where in conflict. The trial court found that absent a statutory definition of "operator" for purposes of R.C. 6109.12, Mr. Beatty and Pastor Beatty, in succession, were "operators" of the Church's public water system based on their leadership roles at the Church as pastor, their

10

repeated involvement with Ohio EPA officials concerning the Church's water system, and the common and ordinary understanding of the term.

{¶35} Specifically, the trial court referenced the Beattys' following activities: meeting with Ohio EPA officials about the sampling and reporting requirements; providing their personal contact information; occasionally corresponding with Ohio EPA officials concerning sampling and reporting; reporting to other Church members regarding such matters; failing to expressly disclaim their status as the Church's representatives until more serious enforcement efforts began; and for many years permitting Ohio EPA officials to believe they were the proper individuals with which to communicate to obtain compliance.

{¶36} The trial court stated it was "laudable" that the Church warned its members not to drink the water and provided bottled water but determined such measures did not meet the statutory requirements and permitted the possibility of accidental consumption of or contact with potentially polluted water.

{¶37} The trial court also imposed a civil penalty of $54,000 and found the Church, Mr. Beatty, and Pastor Beatty to be jointly and severally liable. It stated that the defendants put the public at risk by operating a water system likely unfit for safe consumption, refusing to post required public notices, and "gaming" the system by mislabeling samples contrary to clear instructions.

{¶38} Pastor Beatty[1] now appeals and sets forth the following two assignments of error:

---

1. Mr. Beatty and the Church did not file notices of appeal.

11

{¶39} "[1.] The Court of Common Pleas erred in determining I am the "operator," and thereby a legal representative of a water system.

{¶40} "[2.] The Court of Common Pleas erred in its attempt to exercise authority over a spiritual entity, the Church."

**Standard of Review**

{¶41} The present appeal arises from the trial court's granting of the state's motion for default judgment following two evidentiary hearings.

{¶42} Civ.R. 55(A) provides in pertinent part:

{¶43} "Entry of judgment. When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules, the party entitled to a judgment by default shall apply in writing or orally to the court therefor; * * *. If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or *to establish the truth of any averment by evidence* or to make an investigation of any other matter, the court may conduct such hearing or order such references as it deems necessary and proper * * *." (Emphasis added.)

{¶44} "[W]hether a court shall render a default judgment with or without requiring evidence in support of the plaintiff's claim rests in the sound discretion of the trial judge. * * * Having discretion to require evidence to support the plaintiff's allegations, it follows that the court should make [its] decision conform to the law as applicable to the facts proven, and if no cause of action is shown no default judgment in plaintiff's favor should be rendered." *Streeton v. Roehm*, 83 Ohio App. 148, 152 (1st Dist.1948).

12

{¶45} We have previously held that a trial court's decision to grant or deny a motion for default judgment is reviewed under an abuse of discretion standard. *Sericola v. Johnson*, 11th Dist. Trumbull No. 2015-T-0091, 2016-Ohio-1164, ¶18. Courts have continued to apply this standard of review when a trial court decides a motion for default judgment after hearing evidence. *See, e.g.*, *X-S Merchandise, Inc. v. Wynne Pro, L.L.C.*, 8th Dist. Cuyahoga No. 97641, 2012-Ohio-2315, ¶13; *Queen v. Hanna*, 4th Dist. Scioto No. 11CA3447, 2012-Ohio-6291, ¶32.

{¶46} Accordingly, we will review the trial court's judgment for an abuse of discretion, which is the "failure to exercise sound, reasonable, and legal decision-making." *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶62, quoting *Black's Law Dictionary* 11 (8th Ed.Rev.2004). When an appellate court is reviewing a pure issue of law, the mere fact that the reviewing court would decide the issue differently is enough to find error. *Id.* at ¶67. By contrast, where the issue on review has been confided to the discretion of the trial court, the mere fact that the reviewing court would have reached a different result is not enough, without more, to find error. *Id.*

**Pastor Beatty as an Operator**

{¶47} In his first assignment of error, Pastor Beatty argues that the trial court erred in determining he was the "operator" of the Church's water system.

{¶48} As previously indicated, R.C. 6109.12 requires "every owner or operator of a public water system" to "have analyses of the water made at such intervals and in such manner as may be ordered by" Ohio EPA and to maintain and report "[r]ecords of the results of such analyses  * * as required by" Ohio EPA.

13

{¶49} The applicable regulations in this case are set forth in Ohio Adm.Code 3745-81-21 (monitoring for total coliform), Ohio Adm.Code 3745-81-32 (providing public notification), and Ohio Adm.Code 3745-81-23 (monitoring for nitrate).

{¶50} R.C. 6109.31(A) states "[n]o person shall violate this chapter" or "a rule adopted under it." A "person" includes "an individual, corporation, business trust, estate, trust, partnership, and association." R.C. 6109.01(C); R.C. 1.59. Therefore, the plain language of R.C. Chapter 6109 provides for personal liability against an individual causing the violation. *See State ex rel. DeWine v. Deer Lake Mobile Park*, 11th Dist. Geauga No. 2013-G-3156, 2015-Ohio-1060, ¶58.

{¶51} The real property on which the water system is located is owned by "Church of Troy in trust for the Lord Jesus Christ, true and beneficial owner." Thus, Pastor Beatty's liability is premised on being an "operator" of the Church's public water system who failed to perform required analyses pursuant to R.C. 6109.12 and applicable regulations.

### *Definition of "Operator"*

{¶52} R.C. Chapter 6109 and Ohio Adm.Code Chapter 3745-81 do not define the term "operator." The trial court did not set forth a definition but referenced the "common and ordinary understanding of the term."

{¶53} In the absence of a statutory definition of a term used in a statute, courts may look to the usual and ordinary definition of that term for guidance. *In re M.W.*, 133 Ohio St.3d 309, 2012-Ohio-4538, ¶18. The dictionary definition of "operator" includes "one that operates," such as operating "a machine or device" or "a business." *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/operator (accessed Dec. 27, 2019). The definition of "operates" includes to "bring about, effect,"

14

"to cause to function," and "to put or keep in operation." *Id.*, https://www.merriam-webster.com/dictionary/operates (accessed Dec. 27, 2019).

{¶54} Under its ordinary meaning, the term "operator" can be used in a mechanical sense and in an organizational sense. *See United States v. Bestfoods*, 524 U.S. 51, 66 (1998). According to the U.S. Supreme Court, however, the term "operate" as used in environmental statutes means "more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities." *Id.* at 71.

{¶55} The express purpose of Chapter 6109 is to implement the Safe Drinking Water Act (the "SDWA"), which is a federal statute. *See* R.C. 6109.03; R.C. 6109.01(D); 42 U.S.C. 300f, et seq. Thus, federal law provides guidance for the meaning of the term "operator."

{¶56} The SDWA also does not define the term "operator." Federal district courts that have construed "operator" for purposes of the SDWA have defined it as "someone who manages, directs, or conducts operations specifically related to the [public water system]'s compliance with, or violation of, the SDWA." *See United States v. Ritz*, 772 F.Supp.2d 1017, 1022 (S.D.Ind.2011); *United States v. Alisal Water Corp.*, 114 F.Supp.2d 927, 938 (N.D.Cal.2000). This construction is based on the U.S. Supreme Court's "sharpening" of the definition of the term "operator" for purposes of the Comprehensive Environmental Response, Compensation and Liability Act, where it held "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *See Bestfoods* at 66-67.

15

{¶57} In construing statutory terms, we may also be guided by the use of the same terms defined elsewhere. *See Kinder Morgan Cochin L.L.C. v. Simonson*, 5th Dist. Ashland No. 15 COA 044, 2016-Ohio-4647, ¶21. The phrase "owner or operator" is defined in several other environmental statutes and regulations in the Ohio Revised and Administrative Codes as "any person who owns, leases, controls, operates or supervises" the applicable facility or equipment. *See, e.g.*, Ohio Adm.Code 3745-15-01(T) (air pollution control); Ohio Adm.Code 3745-18-01(B)(10) (sulfur dioxide); Ohio Adm.Code 3745-20-01(B)(42)(a)-(c) (asbestos emission control); R.C. 3753.01(E) and Ohio Adm.Code 3745-104-01(B)(27) (accidental release prevention program).

{¶58} The term "operator" by itself is also defined elsewhere in the Ohio Administrative Code. Under one definition, "operator" means the person who is responsible for the overall operation of a facility. *See* Ohio Adm.Code 3745-50-10(A)(95) (hazardous waste); R.C. 3752.01(O) and Ohio Adm.Code 3745-352-05(X) (cessation of regulated operations). Under a second definition, "operator" means the person responsible for the on-site supervision of technical operations and maintenance of the facility, or any parts thereof, which may affect the performance of the facility and its potential environmental impact, or any person who has authority to make discretionary decisions concerning the daily operations of the facility. *See* Ohio Adm.Code 3745-27-01(O)(5) (solid waste); R.C. 3752-28-01(O)(2) (infectious waste).

{¶59} Finally, according to the Supreme Court of Ohio, considerable deference should be accorded to an agency's interpretation of rules it is required to administer. *State ex rel. Celebrezze v. Natl. Lime & Stone Co.*, 68 Ohio St.3d 377, 382 (1994). Unless the construction is unreasonable or repugnant to the statute or rule, this court should follow

16

the construction given to it by the agency. *Salem v. Koncelik*, 164 Ohio App.3d 597, 2005-Ohio-5537, ¶16 (10th Dist.), citing *Leon v. Ohio Bd. of Psychology*, 63 Ohio St.3d 683 (1992). Ms. Lager testified that Ohio EPA considers an "operator" of a public water system to be "the person who's presented to us as the person * * * who has the authority to make decisions regarding that water system." In light of the above guidance, we cannot say this construction is unreasonable or repugnant to Ohio's safe drinking water requirements.

### *Pastor Beatty's Apparent Authority*

{¶60} We find the trial court did not abuse its discretion in determining that Pastor Beatty was an "operator" of the Church's public water system based on the undisputed evidence of his involvement in and apparent authority to supervise its operation.

{¶61} The evidence establishes that Ohio EPA previously dealt with Mr. Beatty, who has acknowledged he was the "operator" of the Church's public water system until approximately 2010. He further acknowledged that he received the notice of violation from Ohio EPA in 2009, and he was the person with whom Ohio EPA traditionally corresponded. The record reflects he attended Ohio EPA sanitary surveys, and Ohio EPA listed him in its records as the operator. Mr. Beatty had taken water samples for submission to Ohio EPA, and then after experiencing poor health, Mr. Bohanon started collecting the water samples.

{¶62} The record further reflects that on June 15, 2010, Mr. Beatty told Ms. Metropulos that he was semi-retired and was turning over "responsibility of the church" to his son. Mr. Beatty acknowledged that a pastor's duties include "oversight of the church." Based on this representation from the Church's pastor and the admitted operator of the

17

Church's public water system, the point of contact and operator changed to Pastor Beatty. Relying on these representations, Ms. Metropulos began to call and write to Pastor Beatty. This reliance is reasonable given the prior course of dealing with the Church through its prior pastor, Mr. Beatty, and there was no reason to question what Mr. Beatty told her.

{¶63} On June 30, 2010, Ms. Metropulos conducted a site visit with Pastor Beatty. She explained to him the drinking water sample requirements and the need to collect quarterly samples. Critically, he initialed the bottom of the site visit report. Pastor Beatty also gave Ms. Metropoulos his personal cell phone and home phone number rather than the church's telephone number for future contact.

{¶64} Pastor Beatty was present during Ms. Metropulos' sanitary survey of the Church's water system in August 2013. In September 2013, Pastor Beatty granted and then rescinded permission for Ohio EPA to take samples from the Church's water system.

{¶65} These acts furthered cemented the reasonable belief in the mind of Ms. Metropulos that Pastor Beatty had the authority to act on behalf of the Church regarding the operation of the Church's water system.

{¶66} The testimony of Ms. Lager from Ohio EPA demonstrates the reasonable reliance upon the direct representations of transferred authority by Mr. Beatty to his son and the inferences that could be made from the successor pastor's actions when dealing with Ohio EPA. When the trial court asked her how the agency determines who the operator is, she said:

{¶67} "Of course, we look to see who appears and who presents themselves as having the authority to make decisions. For example, if I may, for this entity, often for a

18

church it would be the pastor who typically would tell us has the authority to make decisions for the water system. We correspond with that individual and they have every opportunity to tell us that they are not the one to be speaking to about the water system. Our system, our regulation system is set on, you know, we have to rely on the water systems to be honest that they have to take – We correspond with that individual and they have every opportunity to tell us that they are not the one to be speaking to about the water system."

{¶68} While the doctrine of apparent or ostensible authority is generally utilized in either contract or tort setting, the concepts underlying the doctrine offer useful guidance in the determination of whether one is an "operator" of a public water system.

{¶69} According to the Supreme Court of Ohio, "apparent authority" is "the power to affect the legal relations of another person by transactions with third persons * * * arising from * * * the other's manifestations to such third persons." (Citation omitted.) *Master Consol. Corp. v. BancOhio Natl. Bank*, 61 Ohio St.3d 570, 576 (1991). "Even where one assuming to act as agent for a party in the making of a contract has no actual authority to so act, such party will be bound by the contract if such party has by his words or conduct, reasonably interpreted, caused the other party to the contract to believe that the one assuming to act as agent had the necessary authority to make the contract." (Citation omitted.) *Id.*

{¶70} "Where a principal has by his voluntary act placed an agent in such a situation that a person of ordinary prudence, conversant with business usages, and the nature of the particular business, is justified in assuming that such agent is authorized to perform on behalf of his principal a particular act, such particular act having been

19

performed the principal is estopped as against such innocent third person from denying the agent's authority to perform it." *Id.*

{¶71} "An agent is personally liable to a third person who was injured by the agent's wrong. The existence of the agency relationship is not a defense to an action even though the principle may also be liable to the third party." (Citation omitted.) *Schaefer v. D&J Produce, Inc.*, 62 Ohio App.2d 53, 58 (6th Dist.1978).

{¶72} The concepts underlying apparent authority support the trial court's finding that Pastor Beatty was an "operator." Mr. Beatty, the prior pastor and admitted "operator" of the Church's water system, held out Pastor Beatty, the successor pastor, as the person responsible for the "operation of the church." Pastor Beatty assumed the duties of acting as the point person for Ohio EPA, including granting and rescinding permission to enter the Church's property for sampling. Thus, Ohio EPA was justified in concluding that Pastor Beatty is an "operator," making the Church and Pastor Beatty jointly and severally liable for the failures to comply with the law.

{¶73} Pastor Beatty denies that he ever became the "operator" of the Church's water system and claims his designation is based on his failure to "expressly disclaim" it.

{¶74} However, in a civil enforcement action, the state is not required to "conclusively" prove its claims but is required to prove its claims by a preponderance of the evidence. (Citation omitted.) *State ex rel. DeWine v. Valley View Ents., Inc.*, 11th Dist. Trumbull No. 2014-T-0051, 2015-Ohio-1222, ¶24. Preponderance of the evidence simply means evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it. (Citation omitted.) *Id.* In other words, it is that proof

which leads the trier of fact to find that the existence of the contested fact is more probable than its nonexistence. *State v. Stumpf*, 32 Ohio St.3d 95, 102 (1987).

{¶75} Procedurally, the Church, Mr. Beatty, and Pastor Beatty were all in default of answer. None of the defendants presented any evidence at either hearing to contest the state's evidence that Pastor Beatty had the apparent authority to act as the successor "operator" of the Church's public water system.

{¶76} Further, while the trial court referenced Pastor Beatty's "failure to expressly disclaim" his status to Ohio EPA, this was not the sole basis for its determination. The trial court also expressly referenced Pastor Beatty's affirmative acts, including meeting with Ohio EPA officials about the sampling and reporting requirements, providing personal contact information, occasionally corresponding with Ohio EPA officials concerning sampling and reporting, and reporting to other Church members regarding such matters. Pastor Beatty also engaged in the affirmative acts of granting and then rescinding permission to Ohio EPA to take samples of the Church's water system.

### *Pastor Beatty's Personal Participation*

{¶77} We also find the trial court did not abuse its discretion in determining that Pastor Beatty was an "operator" of the Church's public water system based on the undisputed evidence of his personal participation in the decision-making regarding the water system.

{¶78} An individual may be personally liable if he or she specifically directed the particular environmental violations or participated or cooperated therein. *See State ex rel. Cordray v. Evergreen Land Dev., Ltd.*, 7th Dist. Mahoning No. 15 MA 0115, 2016-Ohio-7038, ¶ 18-20, citing *Jack F. Neff Sand & Gravel*, 11th Dist. Lake No. 2012-L-145,

21

2014-Ohio-2875, ¶52 and *Young v. Featherstone Motors, Inc.*, 97 Ohio App. 158, 171 (1954). For instance, in *Deer Lake*, *supra*, we affirmed the trial court's finding of personal liability for the manager of a mobile home park for violations of the Safe Drinking Water Act and the Water Pollution Control Act where the evidence established that the individual (1) supervised the park, (2) managed the budget and records, (3) oversaw the operation of the water and sewage facilities, (4) served as the Ohio EPA administrative contact for the public drinking water system, (5) had substantial phone contacts with Ohio EPA, and (6) did not correct waste water treatment plant violations despite his knowledge of the violations and his authority to correct them. *Id*. at ¶57.

{¶79} In *Evergreen Land*, the Seventh District affirmed the trial court's finding of personal liability for members of a limited liability company for environmental violations where the evidence established that they (1) had control over the activities at the development site, (2) knew of the violations, (3) had the authority to stop the violations from occurring, and (4) failed to ensure the violations discontinued. *Id*. at ¶29.

{¶80} Similarly in *State ex rel. DeWine v. Sugar*, 7th Dist. Jefferson Nos. 14 JE 0004 & 14 JE 0006, 2016-Ohio-884, ¶41, the Seventh District affirmed the trial court's finding of personal liability for a sole shareholder for environmental violations where the evidence established that he oversaw the project and failed to correct known violations even though he possessed the authority to do so. *Id*. at ¶41.

{¶81} In this case, the evidence establishes that Pastor Beatty served as the Ohio EPA administrative contact for the Church's water system, had substantial contacts with Ohio EPA, and knew of the violations. In addition, the evidence supports a finding that each member of the Church involved in the decision making regarding the water system,

22

including Pastor Beatty, personally and knowingly participated in the violations of Ohio's safe drinking water requirements.

{¶82} For instance, after Ms. Metropulos' site visit with Pastor Beatty in June 2010, the Church began submitting samples but intentionally mislabeled them as "special purpose," which is a marking used only for an investigation. Ms. Metropulos testified regarding the potential effect of these actions:

{¶83} "If that same sample were to be labeled special purpose, our system would miss that and so nobody, none of the inspectors would be notified that a system had an issue. It would put the public at risk because we would not generate a letter telling the water system that they needed to do follow-up, and we would not necessarily be aware that there is an issue at the water system."

{¶84} Pastor Beatty testified that decisions regarding the operation of the Church's water system were made not solely by him but through "counsel of other men" in the Church:

{¶85} "Q.     Who made the decision not start labeling the samples special purpose samples?

{¶86} "A.     The church made the decision.

{¶87} "Q.     Did Mr. Joe Bohanon make that decision, participate in the making of that decision?

{¶88} "A.     The church made that decision.

{¶89} "Q.     Did you participate in that decisionmaking process?

{¶90} "A.     The church made that decision collectively together.

{¶91} "Q.     Were you part of that collection of people making that decision?

{¶92} "A.    I am part of the Church of Troy.

{¶93} "Q.    With respect to that particular decision were you part of that collection of people making that decision?

{¶94} "A.    I am part of the Church of Troy, yes.  I did not make that decision. That decision was made as a church."

{¶95} Thus, the members of the Church made the conscious decision to submit water samples to Ohio EPA in such a fashion as to assure the samples would not be flagged as problematic.  While Pastor Beatty may be offended by the trial court's characterization of these actions as "gaming the system, it demonstrates sophisticated knowledge and deliberate manipulation of Ohio EPA's labeling system.  The effect of this decision was to put the Church's members and unsuspecting visitors at risk from contaminated drinking water.

{¶96} Pastor Beatty offered no contrary evidence as to who operated the water system, nor does he argue in his brief who was the operator.  When asked at oral argument who was the operator, he could not give an answer.  Pastor Beatty apparently believes that if the members of the Church as a whole make all decisions regarding the Church's water system, no one is responsible.  That is not a reasonable conclusion.

{¶97} Rather, if the members of the Church as a whole made all decisions about the operation of the Church's water system, then Pastor Beatty necessarily knew of the problems with the water system.  He was aware of the regulations, the notices of violations, and what was required of the Church to both remediate and to maintain compliance with the safe drinking water laws of this state.  He chose to ignore those laws and/or take affirmative steps to circumvent those laws.  Thus, Pastor Beatty, based on

24

his membership in the Church and his personal participation in the decision-making regarding the Church's public water system, is an "operator."

{¶98} Based on the foregoing, the trial court did not abuse its discretion in determining Pastor Beatty was an "operator" of the Church's water system.

{¶99} Pastor Beatty's first assignment of error is without merit.

### Jurisdiction over the Church

{¶100} In his second assignment of error, Pastor Beatty argues that because the Church is not a corporation, neither Ohio EPA nor the trial court has jurisdiction over it.

{¶101} To the extent Pastor Beatty raises arguments to challenge the Church's liability, the Church has not filed a notice of appeal from the trial court's judgment. Only Pastor Beatty has filed a notice of appeal. Generally, a litigant must assert his own rights and not the rights of third parties. *N. Canton v. Canton*, 114 Ohio St.3d 253, 2007-Ohio-4005, ¶14.

{¶102} Further, although an individual party may represent himself, such right of self-representation does not extend to parties who are not natural persons. *In re Lawson*, 98 Ohio App.3d 456, 465 (10th Dist.1994). Therefore, even if the Church had appealed, Pastor Beatty would not be permitted to present arguments on its behalf.

{¶103} Pastor Beatty's second assignment of error is without merit.

{¶104} Based on the foregoing, the judgment of the Geauga County Court of Common Pleas is affirmed.


THOMAS R. WRIGHT, J., concurs in judgment only, with a Concurring Opinion,
MATT LYNCH, J., concurs in part and dissents in part, with a Concurring/Dissenting Opinion.

25

_____

THOMAS R. WRIGHT, J., concurs in judgment only, with a Concurring Opinion.

{¶105} Generally, allegations in a complaint not denied are deemed admitted. Civ.R. 8(D). Pastor Beatty did not deny the allegation that he was the operator of the water system. Nevertheless, the trial court exercised its discretion to hold a hearing on this issue. Civ.R. 55(A); *Streeton v. Roehm,* 83 Ohio App. 148, 152, 81 N.E. 2d 133 (1stDist. 1948).

{¶106} Mr. Beatty, Pastor Beatty's father, served as pastor for 37 years and acknowledged he was the operator of the Church's water system. Upon Mr. Beatty's retirement, Pastor Beatty assumed his duties. Pastor Beatty then interacted with the Ohio EPA and provided its representatives with his home and personal cell numbers. Pastor Beatty met with Ms. Metropulos on site and was informed of testing requirements. He told her that testing would be deferred pending a legal decision. He then informed the EPA that it could test and later informed that it could not.

{¶107} Against this, and amid an overarching position that compliance with EPA regulations governing testing and prohibiting fecal contaminated water systems was not required in light of the First Amendment right to free exercise of religion, Pastor Beatty presented evidence that neither he nor anyone else was the operator of the water system and that all water system decisions were made by the church members after discussion.

{¶108} The trial court was in the best position to judge credibility and was free to believe all, some, or none of the testimony of each witness appearing before it. *Bevan v. Bevan*, 11th Dist. Lake County No. 2005-L-018, 2006-Ohio-2775 ¶ 25. Moreover, it is in the trial court's province to draw reasonable inferences. *State v. Nevius*, 147 Ohio St.

26

263, 274, 71 N.E.2d 258 (1947). "'An "inference" is a conclusion which, by means of data founded upon common experience, natural reason draws from facts which are proven.'" (Citation omitted.) *Id.* Although not dispositive, the evidence, together with reasonable inferences, supports the trial court's conclusion that Pastor Beatty was the operator of the water system. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517. The trial court therefore did not abuse its discretion in granting default judgment. That the evidence can be argued to the contrary does not change this and fails to afford the trial court due deference. *State ex rel. Pizza v. Strope*, 54 Ohio St.3d 41, 45-46, 560 N.E.2d 765 (1990). Additionally, despite the dissent's representation to the contrary, the trial court did not, the lead opinion does not, and I do not decide this case solely or even primarily on Pastor Beatty being the EPA contact. It is but one relevant consideration in the totality of the evidence.

{¶109} Next, neither the trial court nor this court has given *any* deference to an EPA interpretation or decision defining operator. Accordingly, the dissent's discussion of the perils of deferring to administrative agencies is advisory and best left for another day. *State ex rel. United Auto., Aerospace & Agricultural Implement Workers of Am. v. Bur. of Workers' Comp.,* 108 Ohio St.3d 432, 2006-Ohio-1327, 844 N.E.2d 335, ¶ 60 (courts decide cases and controversies and refrain from advisory opinions).

{¶110} Last, because the Church is not a party to this appeal, the "brusque" conclusion of the second assignment is warranted unlike the dissent's advisory opinion. *Id.*

_____

MATT LYNCH, J., concurs in part and dissents in part, with a Concurring/Dissenting Opinion.

{¶111} While I concur, with some reservations, with the majority's resolution of the second assignment of error, I must ardently dissent from the majority's decision to affirm the judgment against Stephen Beatty and the determination that he is the "operator" of a public water system. Careful consideration of the record and evidence presented in this matter reveals that Beatty was not responsible for the operation of the water system and was targeted for enforcement by the EPA merely because he was their contact person and was cooperative with their requests. The majority's interpretation of what constitutes an "operator" is extremely broad and opens the door for EPA enforcement actions against anyone who is associated with an entity that has a public water system and who chooses to interact with the EPA and accept its communications, something the legislature certainly could not have intended.

{¶112} The term "operator," in its most logical sense, applies to those people who are responsible for or oversee the physical maintenance, service, and testing of a public water system. While "operator" is not defined in R.C. 6109, it is most commonly defined as "[o]ne that operates [or runs] a mechanical device" or "[t]he owner or manager of a business." *Webster's II New College Dictionary* 767 (1999).

{¶113} This interpretation is further buttressed by the Ohio Administrative Code sections cited by the majority, which characterize an operator as one who owns, leases, controls, operates, or supervises the applicable facility or equipment as well as one who is responsible for the facility's operation or supervising technical operations. Ohio

28

Adm.Code 3745-15-01(T); Ohio Adm.Code 3745-27-01(O). These definitions require more than mere involvement with or employment by a business or entity that has a public water system. Rather, they look toward the person who has the physical responsibility for maintaining such system or the owner of the property.

{¶114} Additional insight into the characteristics of an operator under R.C. 6109.12 may be found by a review of the definition of a "professional operator" under Ohio Adm.Code 3745-7-01. Among other things, that section lists the types of work experience which the EPA accepts to become a professional operator, including "hands-on operation and maintenance of a public water system" but specifically excludes "clerical duties" as such qualifying experience. Ohio Adm.Code 3745-7-01(O)(2)(b)(iii) and (e)(i).

{¶115} The foregoing definitions do not justify a conclusion that Beatty operated a public water system. He neither owns nor leases the Church of Troy and did not claim to be responsible for the church or water system's operation. He does not "operate" the water system in a physical sense and he did not perform repairs or work on the system. The testimony indicated that another individual, Bohanon, performed water testing. Decisions relating to matters such as the maintenance and operation of the church were jointly made with church members. The evidence showed that all of the actions of Beatty, such as responding to EPA calls and correspondence, were of a clerical nature only and that he had no day-to-day responsibilities regarding the water system.

{¶116} The majority views Beatty as an operator with personal responsibility because he was aware of the violations, participated in decision-making regarding the water system, and had contacts with the EPA regarding the system. The majority relies on several authorities to support this proposition, each of which is distinguishable. In

29

*State ex rel. DeWine v. Deer Lake Mobile Park, Inc.*, 2015-Ohio-1060, 29 N.E.3d 35 (11th Dist.), this court concluded that the defendant could be personally liable for violations of the safe drinking water laws since he was employed to manage and operate Deer Lake Mobile Park, oversaw the water system and the day-to-day operations of the Park, served as the Ohio EPA administrative contact for the public drinking water system and had substantial phone contacts with the Ohio EPA, and did not correct violations despite his knowledge and authority to do so. *Id.* at ¶ 57.

{¶117} In the present matter, however, Beatty had limited involvement in relation to the water system at the church. He was not a paid employee of the church and was not appointed with the task of overseeing the water system as was the defendant in *Deer Lake*. He corresponded with the EPA and answered their questions merely because they had directed their communications toward him rather than others at the church. As outlined above, the testimony and evidence demonstrated that he had no involvement in taking water samples or submitting them to the EPA and, further, when issues arose relating to the EPA, these were presented to the congregation of the church as a whole to determine the proper course of action to proceed. Unlike in *Deer Lake*, Beatty did not take on the task of water system maintenance.

{¶118} It is also evident in *Deer Lake* that procedural differences were present, since during the course of the proceedings but prior to trial, the appellants had entered into a "consent order" with the EPA, agreeing to perform certain activities required of a public water system. *Id.* at ¶ 5. This demonstrated the recognition that these tasks were to be performed by appellants. In contrast, during the proceedings in the present matter, Beatty continually objected to contentions that he was responsible for the operation or

30

testing of the water system.

{¶119} In *State ex rel. Cordray v. Evergreen Land Dev., Ltd.*, 7th Dist. Mahoning Nos. 15 MA 0115 and 15 MA 0116, 2016-Ohio-7038, while the members of an LLC were found personally liable for environmental violations, they were owners of the property who were also involved specifically in decision-making relating to the violations and in the day-to-day physical operations of the property. The defendants jointly made the decision to install the sewer system giving rise to the violations, one supervised the property while work was being done that led to the violations and the other was an engineer who went to meetings relating to environmental concerns, and there were no employees of the company. *Id.* at ¶ 25-29. This differs greatly from the present matter, where Beatty's involvement in the church was primarily spiritual and he had no ownership interest in the property.

{¶120} In *State ex rel. DeWine v. Sugar*, 2016-Ohio-884, 60 N.E.3d 735 (7th Dist.), the defendant was found to have personal liability because he was the "sole decision-maker" for the company involved, which the undisputed testimony demonstrated was not the case for Beatty as pastor of the Church of Troy.

{¶121} Finally, although the majority minimizes this issue, it is evident from the record that the primary justification for the EPA bringing suit against Beatty, and for a judgment against him, was the mere fact that the EPA was able to communicate with him and then chose to designate him as their point of contact.

{¶122} It requires a significant leap of logic to utilize Beatty's acceptance of correspondence and reciprocation of EPA communications as grounds to characterize him as an "operator" of the water system. The decision that a "point of contact" is

31

synonymous with an operator is the apparent policy of the EPA, according to the testimony of its employees, and is not based on any legal authority. Under this logic, if a secretary or office manager undertook the responsibility of communicating with the EPA and receiving correspondence as a part of the routine task of maintaining office communication, he or she could be found to be the operator of a public water system. In this case, several members of the congregation were present during interactions with the EPA and an ecclesiastical law attorney also communicated with the EPA on behalf of the church. Since those persons also chose to initiate contacts with the EPA, it stands to reason that the EPA could decide they were also operators, which, as noted above, does not appear to be the intended meaning of the word "operator" in this context, lest anyone who participates in an organization, church, club, or group that makes joint decisions and has a water system ends up being a potential litigant. This interpretation not only impossibly stretches the meaning of this word but also disincentivizes citizens from interacting with the Ohio EPA to resolve environmental issues, a result that only compounds the problems the EPA purports to resolve.

{¶123} If courts accept the EPA's determination that a person is an operator by virtue of the sole fact that the EPA designated them as a contact, this effectively eliminates the court's role in the proceedings and gives the EPA the authority to make that decision on its own, allowing it to create a statutory definition of "operator." This places too much power in the hands of the EPA as an administrative agency. The determination of whom might be an operator under Chapter 6109 is an essential prerequisite to a finding of liability. Accordingly, the EPA is required to establish the status of Beatty as an operator. EPA employee Christel Lager testified that an operator is

someone "who's presented to us as the person * * * who has the authority to make decisions regarding that water system," and that Beatty should be considered an operator because the EPA communicated with him and he did not deny being the operator. This conclusory testimony does not constitute evidence of whether Beatty was *actually* the operator. It is also inconsistent with the evidence in the record demonstrating he did not have this authority, and, rather, the congregation as a whole made such decisions. Thus, there was insufficient evidence for a reasonable trier of fact to determine that Beatty was the operator and the trial court erred in reaching this conclusion. *See Estie Invest. Co. v. Braff*, 11th Dist. Lake No. 2017-L-172, 2018-Ohio-4378, ¶ 32.

{¶124} The concurring judge asserts that the majority does not decide this case solely based on Beatty being designated as the EPA's contact person and, rather, that the totality of the circumstances was considered. The opinion of this court demonstrates otherwise. Almost the entirety of its analysis on whether Beatty was an operator relates to the fact that he responded to EPA communications, correspondence was directed at him, and he was willing to provide information upon their request. These facts do not demonstrate whether Beatty actually operated the water system but, rather, evince the weight given to the EPA's decision to designate him as the operator and, at best, show only his willingness to cooperate rather than prove any legal obligation. The opinion is replete with references to the EPA's determination that a contact person who responds to their request is designated an operator, reinforcing the improper weight given to EPA opinions rather than demonstrated facts.

{¶125} Given the foregoing, a broader review of the relationship between a citizen's rights and the state's administrative authority is warranted. The involvement of

33

administrative agencies in the day-to-day lives of citizens, as well as the power these agencies wield in decision-making and enforcement, is at the forefront of this case. Unfortunately, such power may be exercised in a manner that is inconsistent, unfair, and oversteps the bounds of entities that are simply not a coequal branch of government.

{¶126} This concern with the unchecked power of administrative agencies is not a new one. Over 60 years ago, it was observed that "[t]he rise of administrative bodies probably has been the most significant legal trend of the last century[.] * * * They have become a veritable fourth branch of the Government, which has deranged our three-branch legal theories * * *." *Fed. Trade Comm. v. Ruberoid Co.*, 343 U.S. 470, 487, 72 S.Ct. 800, 96 L.Ed. 1081 (1952) (Jackson, J., dissenting).

{¶127} Apprehension about the increase of administrative power became even more heightened following the United States Supreme Court's decision in *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 866, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which found that an agency's decision should be upheld by the reviewing court if it is not contrary to law, provided it is based on a "permissible construction of the statute." The propriety of such deference has been questioned, with Supreme Court Justice Clarence Thomas expressing concerns that administrative agencies, in pursuing their objectives, would rely on their own interpretations of the law, emphasizing that the Court should be "alarmed that [the EPA] felt sufficiently emboldened by [past precedent] to make the bid for deference that it did here." *Michigan v. Environmental Protection Agency*, 576 U.S. 743, 763, 135 S.Ct. 2699, 2713, 192 L.Ed.2d 674 (2015) (Thomas, J., concurring) (taking issue with the EPA's attempt to assert the "power to decide—without any particular fidelity to the text—which policy goals [it] wishes to pursue").

{¶128} Overreach by administrative agencies impacts all citizens of this country. In *City of Arlington, Tex. v. Fed. Communications Comm.*, 569 U.S. 290, 313, 315, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013), Chief Justice John Roberts observed that "the danger posed by the growing power of the administrative state cannot be dismissed," emphasizing that the administrative state "wields vast power and touches almost every aspect of daily life." (Citation omitted.) As he aptly observed, "[t]he Framers could hardly have envisioned today's 'vast and varied federal bureaucracy' and the authority administrative agencies now hold over our economic, social, and political activities." (Citation omitted.) *Id.* at 313 (Roberts, C.J., dissenting).

{¶129} While the administrative agencies within our country serve a valid purpose, their power to act in a role that goes beyond the scope of their authority undercuts citizens' rights and expectations to due process, consistent results, and confuses the role of the different branches of our government. United States Supreme Court Justice Neil Gorsuch has frequently expressed these concerns in his tenure as a federal judge, emphasizing that the implementation of policies by administrative agencies can often be inconsistent with the separation of powers doctrine and noting the impact of administrative agencies wielding too much power. *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1154-1158 (10th Cir.2016) (Gorsuch, J., concurring). More recently, Justice Gorsuch again warned against the dangers to the doctrine of the separation of powers posed by administrative agencies:

> Our Nation's founders were painfully aware of the dangers of executive and legislative intrusion on judicial decision-making. One of the abuses of royal power that led to the American Revolution was King George's attempt to gain influence over colonial judges. Colonial legislatures, too, had interfered with the courts' independence "at the behest of private interests and factions." These

35

experiences had taught the founders that "'there is no liberty if the power of judgment be not separated from the legislative and executive powers.'" They knew that when political actors are left free not only to adopt and enforce written laws, but also to control the interpretation of those laws, the legal rights of "litigants with unpopular or minority causes or . . . who belong to despised or suspect classes" count for little. Maybe the powerful, well-heeled, popular, and connected can wheedle favorable outcomes from a system like that—but what about everyone else? They are left always a little unsure what the law is, at the mercy of political actors and the shifting winds of popular opinion, and without the chance for a fair hearing before a neutral judge. The rule of law begins to bleed into the rule of men.

(Footnotes omitted.) *Kisor v. Wilkie*, 588 U.S. ___, 139 S.Ct. 2400, 2437-2438, 204 L.Ed.2d 841 (2019) (Gorsuch, J., concurring).

{¶130} Courts must interpret and apply law rather than allowing agencies to do so, since "[t]he framers sought to ensure that the people may rely on judicial precedent about the meaning of existing law until and unless that precedent is overruled or the purposefully painful process of bicameralism and presentment can be cleared." *Gutierrez-Brizuela* at 1151 (Gorsuch, J., concurring).

{¶131} Courts must not merely rubberstamp the EPA's interpretation or application of the law, as this risks the erosion of the separation of powers and politicization with which Gorsuch raised alarm. Allowing agencies such unchecked power leads to due process concerns and ultimately threatens citizens with the supreme power warned of by Alexis de Tocqueville:

> It [supreme power] covers the surface of society with a network of small complicated rules, minute and uniform, through which the most original minds and the most energetic characters cannot penetrate, to rise above the crowd.

de Tocqueville, *Democracy in America, Volume II*, 319 (1840).

{¶132} These concerns are implicated in the present matter, since the court relied

on the EPA's apparent internal policy to characterize their point of contact as an "operator," which creates serious consequences for that individual, rather than law established by properly elected legislators or neutral judges. This should sound the alarm bells raised by our forefathers and prominent legal scholars, as the EPA sought not just to aid in enforcing the law but efforted to advance this power in a way that would encourage the deference from the courts that Justice Thomas found troubling.

{¶133} Returning to the question of Beatty's personal liability, the fact that he did not disclaim that he was the operator of the water system also does not establish liability. This would presume that Beatty had familiarity with the intricacies of public water system law and would even be aware of the implications of being considered an "operator" of a water system. He cannot be held liable for operating a public water system merely because he did not realize that his failure to disclaim such liability would result in an erroneous interpretation of his responsibilities. Contrary to the majority's position, the fact that James Beatty announced that his son would succeed him as pastor also does not equate to holding him out to be the operator of a water system. It is illogical and speculative to conclude that a pastor of a church is automatically the water system operator, and not consistent with the facts of this case.

{¶134} The EPA seeks to place a large monetary penalty on Beatty solely because he voluntarily cooperated and interacted with the EPA. Apparently, both the EPA and the majority believe that the pastor is responsible for all physical aspects of the church despite the uncontradicted testimony that the members agree to make joint decisions regarding the welfare of the church. The majority strains so far as to even demand that Beatty

provide evidence as to who the operator may be.[2]  However, the burden is on the EPA, not Beatty, to identify the operator by a preponderance of the evidence.  *See State ex rel. Cordray*, 2016-Ohio-7038, at ¶ 23.

{¶135} The majority also holds that Beatty is an operator based on his apparent authority to supervise the operation of the public water system at the Church of Troy. Such a conclusion extends the application of the doctrine of apparent authority beyond its proper scope.  This doctrine is wholly inapplicable to the facts and circumstances in the present matter.

{¶136} Under the doctrine of apparent authority, a "*principal may be liable* to a third party for the acts of the principal's agent, even though the agent had no actual authority, if the principal has by his words or conduct caused the third party to reasonably believe that the agent had the requisite authority to bind the principal," i.e., appeared to give authority to the agent.  (Emphasis added.)  *Republic Waste Services of Ohio Hauling, L.L.C v. Pepper Pike Properties, Inc.*, 8th Dist. Cuyahoga No. 81525, 2003-Ohio-1348, ¶ 21, citing *Miller v. Wick Bldg. Co.*, 154 Ohio St. 93, 104, 93 N.E.2d 467 (1950).  "Under an apparent-authority analysis, an agent's authority is determined by the acts of the principal rather than by the acts of the agent."  (Citation omitted.)  *State v. Billingsley*, 11th Dist. Portage Nos. 2010-P-0030 and 2010-P-0031, 2011-Ohio-1586, ¶ 25; *Master Consol. Corp. v. BancOhio Natl. Bank*, 61 Ohio St.3d 570, 576, 575 N.E.2d 817 (1991); *Globalcor Assocs. LLC v. Law Office of Robert Soles*, 5th Dist. Stark No. 2018CA00090, 2019-Ohio-2208, ¶ 59 ("[s]imply stated, there is a 'holding out' of the agent

---

[2].  It is worth noting that although the majority cites Beatty's failure at oral argument to supply an answer to the question of who operates the water system, this is not evidence and can bear no weight in this court's analysis.

38

as such to the public by the principal and a reliance on that holding out by the plaintiff").

{¶137} The doctrine of apparent authority is typically applied as a means of ensuring that a party acting in reliance on the representations of an agent not qualified to make such representations is protected from the consequences of their reliance. This doctrine is most commonly utilized in matters of contract or tort where an agency relationship is often present, to protect an "innocent third person" from relying on this agency relationship to his detriment. *Master Consol.* at 576; *Shaffer v. Maier*, 68 Ohio St.3d 416, 418, 627 N.E.2d 986 (1994). The majority cites no authority for the proposition that this doctrine is properly extended to cases involving the enforcement of environmental regulations or other administrative matters. Noticeably absent in such cases is any reliance necessitating the application of apparent authority to reach an equitable result.

{¶138} In the present matter, the EPA did not take action to its detriment in reliance on representations made by anyone relating to the church. The EPA is not foreclosed from bringing suit against anyone it might believe is otherwise liable nor is it prevented from recovering against the proper parties. In fact, the EPA did recover against both the father and the Church of Troy. The apparent authority doctrine simply is not intended to apply to this type of case nor should it be utilized in such a manner to avoid interpreting and applying the law already in place: whether the party against whom liability is sought was actually an operator of a water system. Having the authority to speak to the EPA, regardless of whether it was provided through apparent authority or otherwise, does not correlate with having responsibility to operate a public water system. This requires making a leap of logic that is not supported by statute or legal precedent.

39

{¶139} Perhaps even more significantly, attempting to shoehorn the facts of this case into the doctrine of apparent authority for the purposes of establishing Beatty's liability is simply impossible given that apparent authority applies to hold a *principal* liable. *Miller*, 154 Ohio St. at 100, 93 N.E.2d 467. Not only are the acts of the principal the relevant consideration in determining whether its agent has authority, but it is also the principal who is bound by an agent's acts. Even if we were to accept that Beatty had acted as an agent, which is necessary for this doctrine to apply, this would not justify finding him, rather than a principal, liable for failure to properly operate the water system. Of note, both the church and Beatty's father James, the parties which could potentially be argued to be the "principals," have already been found liable. Thus, this matter has been resolved as to the only parties that would be arguably subject to consequences under the apparent authority doctrine.

{¶140} Finally, it is important to address the majority's conclusion that Beatty and the church were "gaming the system" and put visitors at risk of drinking contaminated water. We should be cautious of using such language to characterize Beatty's actions as being taken with willful disregard of the EPA's requests and, more importantly, intent to harm others, which is simply not borne out by the record. The unrefuted testimony demonstrated that, Beatty and other church members did not ignore contacts by the EPA or fail to honestly communicate with them and were in consistent contact with the EPA. While they questioned which actions were required under the law, specific steps were taken to avoid church members ingesting any potentially contaminated drinking water, such as utilizing bottled water.

{¶141} As to the second assignment of error, the majority correctly concludes that the Church of Troy has not filed a notice of appeal and the law prevents Beatty from representing the church or advancing arguments on its behalf. While this conclusion is accurate, this brusque analysis declines to address several issues that warrant further discussion for the purposes of clarification and adequately representing the status of the parties.

{¶142} First, the State contends that the Church of Troy is an "unincorporated nonprofit association" and, thus, a "person" under Ohio law subject to the terms of R.C. 6109.31, which provides that "no person" shall violate Chapter 6109. *See* R.C. 6109.01(C); R.C. 1.59(C) (a "person" is defined as "an individual, corporation, business trust, estate, trust, partnership, [or] association"). In analyzing this issue, the State sets forth that the religious exception from the definition of an "unincorporated nonprofit association" does not apply to the Church of Troy. Pursuant to R.C. 1745.05(M)(5), an "unincorporated nonprofit association" is an "unincorporated organization, consisting of two or more members joined by mutual consent pursuant to an agreement, written, oral, or inferred from conduct, for one or more common, nonprofit purposes" but does not include "[a] religious organization that operates according to the rules, regulations, canons, discipline, or customs established by the organization, including any ministry, apostolate, committee, or group within that organization."

{¶143} I disagree with the assertion that the Church of Troy is not a religious organization to which the exception applies. The uncontradicted testimony of Stephen Beatty demonstrated that the Church of Troy utilized the Bible for its "constitution and bylaws." There is no reason to reject the testimony of its pastor as to that fact, nor should

41

a court interfere with a church's right to assert the Bible as the rules it has established as those that it operates under. That a church chooses not to establish or create a separate set of rules apart from the Bible should not remove it from this exception.

{¶144} Finally, it is important to address Beatty's assertion that "[t]here is no legal precedent for the Court to enter into the Realm of God when the Church has not entered into the Realm of Caesar," since the Church of Troy is not incorporated.

{¶145} Article I, Section 7 of the Ohio Constitution dictates that "[a]ll men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience * * * nor shall any interference with the rights of conscience be permitted * * *." However, a generally applicable, religion-neutral state regulation is violative of one's rights only if the plaintiff shows "that his religious beliefs are truly held and that the governmental enactment has a coercive affect against him in the practice of his religion," and the state fails to prove that the regulation furthers a compelling state interest and the regulation is the least restrictive means of furthering that interest. *Humphrey v. Lane*, 89 Ohio St.3d 62, 68-69, 728 N.E.2d 1039 (2000). While the record clearly supports that Beatty is sincere in his religious beliefs, it is also evident that the government's regulation of the church's water system does not prevent Beatty from practicing his religion. Further, properly applied regulations requiring operators and owners to collect samples a few times a year do serve a compelling interest of protecting members of the public from unsafe drinking water.

{¶146} Although certainly not controlling legal authority, appellant may wish to consider what Jesus said in Matthew 22:21: "Render therefore to Caesar the things that are Caesar's, and to God the things that are God's." The church is not exempt from

42

following the laws in instances where such regulations do not interfere with their religious practice or ideals. This principle, of course, must be applied by courts with caution, lest they risk interfering with an unquestionable and sacred Constitutional right to free exercise of one's religion.

{¶147} For the foregoing reasons, I concur with the judgment of the court to affirm on the second assignment of error since it is not raised by the proper party before this court, but would reverse the judgment against Beatty as the evidence and law demonstrate that he is not the operator of a public water system.